Opinion issued October 2, 2014



In The

# Court of Appeals

For The

## First District of Texas

———————————————

### NO. 01-12-00229-CV

———————————————

**JONATHAN LEVINE AND SAMANTHA LEVINE, Appellants**

**V.**

**STEVE SCHARN CUSTOM HOMES, INC., STEVE SCHARN, AND NEWFIRST NATIONAL BANK, Appellees**

---

On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Case No. 08-DCV-162201

---

## O P I N I O N

Appellants, Jonathan and Samantha Levine, sued Steve Scharn Custom Homes, Inc. (SSCHI), Steve Scharn, and NewFirst National Bank for various

claims relating to construction of a new home.[1]  SSCHI counter-sued for breach of contract and defamation.  NewFirst counter-sued seeking sanctions for the claims filed against it.  The trial court granted summary judgment against the Levines on some of their claims against NewFirst.  A jury later determined that the Levines had breached the contract with SSCHI first and awarded damages to SSCHI.  It also determined that the Levines had defamed SSCHI.  The Levines did not prevail on any of their claims against SSCHI or NewFirst.  After trial, the trial court awarded sanctions in favor of NewFirst and against the Levines.

On appeal, the Levines argue that (1) the trial court abused its discretion by denying their request for a jury instruction on SSCHI's defamation claim, (2) the evidence is legally insufficient to support the jury's determination that the Levines defamed SSCHI, (3) the evidence is legally insufficient to support the jury's damage award for defamation, (4) the evidence establishes as a matter of law that SSCHI breached the construction contract first, (5) the jury's determination that the Levines breached first is against the great weight and preponderance of the evidence, (6) the Levines are entitled to recover their damages against SSCHI, (7)

---

[1]    Steve Scharn, individually, was a party to the suit at trial.  He did not obtain any recovery in the judgment, however, and no judgment was obtained against him. Scharn has not asserted any error on appeal, and the Levines have not raised an issue on appeal that would have any legal effect on him.  Accordingly, we do not consider him a proper party to this appeal.  *See Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 751 n.4 (Tex. App.—Houston [14th Dist.] 2004, pet. denied).

the Levines are entitled to recover their attorneys' fees against SSCHI, (8) the trial court erred by granting summary judgment on their claims against NewFirst, and (9) the trial court abused its discretion by awarding sanctions in favor of NewFirst.

We affirm.

## Background

The Levines bought two lots in a development in Fort Bend County with plans to build a home on the lots. The first builder they hired, M&A Construction, laid the foundation for the home. Problems with the foundation were identified, and the Levines terminated their contract with M&A Construction.

The Levines subsequently met Scharn, the president and part owner of SSCHI, and ultimately entered into a contract with SSCHI to complete the construction of their home. The Levines had money to cover most of the cost of construction of the home, but not all of it. They needed to obtain a loan for the remainder of the cost of construction. Scharn recommended NewFirst to the Levines.

The Levines ultimately entered into a loan agreement with NewFirst. Under the terms of the loan agreement, one of the prerequisites for NewFirst to authorize a loan to the Levines for the construction of their home was that the Levines had to open an account with NewFirst and deposit $814,990.35 in the account. The loan agreement provided that the deposited amount would be used to pay for the costs

3

of construction of the home. Only once the deposited amount was fully dispersed would NewFirst issue any funds under the loan agreement. The loan agreement also provided that no fiduciary relationship existed between the parties.

When the Levines deposited their money in the NewFirst account, NewFirst placed a hold on the account, which prevented the Levines from withdrawing money from the account for any purposes other than the construction of the home. The deposit agreement creating the NewFirst bank account provided that one signature was required for a withdrawal.

Along with the construction agreement, the Levines and SSCHI signed an agreement concerning builder and mechanic liens. The agreement required SSCHI to provide the Levines with receipts. Specifically, it provided,

> [SSCHI] shall furnish [the Levines] proper receipts and releases from any and all materialmen from whom any material is obtained by [SSCHI] for use in said improvements, and from all sub-contractors, as well as from each and all the workmen who have worked thereon, to the end that no liens may be fixed upon said premises save and except the express liens herein created.

While construction was ongoing, only one lien was filed on the property. That lien was filed by mistake and was removed as soon as the error was brought to the attention of the party that filed the lien.

Once the parties had entered into the construction agreement and the loan agreement, SSCHI began construction on the home. Construction started around mid-June 2007. Eventually, disputes arose about the quality of SSCHI's work and

its conformity with the construction plans. In November, the Levines sent SSCHI a letter, through their counsel, explaining the numerous complaints they had about the construction. On January 4, 2008, the Levines formally terminated the construction contract.

While construction was ongoing, SSCHI obtained three draws from NewFirst on the Levines' account. These three draws totaled $475,355.38. Before it requested each draw on the Levines' bank account from NewFirst, SSCHI presented the Levines with a Contractor's Disbursement Disclosure for Residential Construction. Each disbursement disclosure provided, "The following is the information required to be provided under the Texas Property Code in connection with this payment request on the above-described project." Near the bottom of the page, the document identified the date it was received by the Levines and, below that, contained the signatures of the Levines.

The Levines were also presented with a similar document, entitled Lender's Disbursement Disclosure for Residential Construction. This disclosure provided, "The following is the information required to be provided under the Texas Property Code in connection with a payment request on the above-described project." It also identified the date it was received by the Levines and, below that, contained the signatures of the Levines.

The Levines brought suit against SSCHI and NewFirst in February 2008. The Levines asserted a number of claims against SSCHI, including breach of contract. SSCHI counter-claimed for breach of contract against the Levines. The central dispute at trial was who breached the contract first. The jury found that both parties breached the contract but that the Levines breached first and that SSCHI's breach was excused.

By at least November 2008, the Levines were receiving complaints from the neighbors to the Levines' lots that the uncompleted structure was an eyesore and a nuisance. Jonathan Levine sent an email to one of the residents, John Hettig, with the subject line "10 Sovereign Circle- The House That Crooks Ruined." The body of the email stated,

> I can only apologize for the inconvenience and welcome you to look up Levine versus Steve Scharn Custom Home builders, Mark Millis and the Millis Development Company, New First Bank as well as Royal Palm Homes Inc., Ron Scharn, and Ron Scharn's Wife's Insurance Company in the Fort Bend civil court if you would like to know about the injustice occurring in our community. Also look up Levine versus Mark Blake and M and A Custom Homes. Hopefully you will also share it with everyone else. You should also talk to Dr. Jalal as well. I can only say that you are very fortunate to have had a[n] honest builder. We have had 2 crooks.

In response, Hettig stated, "Thanks . . . . My concern is not with your business but [the] value of Sovereign Shores! Unfortunately, your house has become a major detriment."

Scharn learned of this email from Hettig. Specifically, Scharn testified at trial as follows:

Q. All right. And do you know why Dr. Levine sent this e-mail?

A. No, sir.

Q. Okay. So, the -- you're just assuming he's talking about you? You don't know that he's talking about you?

A. I know that he's talking about me.

Q. Why do you know that he's talking about you?

A. Because I had a conversation with Mr. Hettig, who told me.

Q. He told you what?

A. That he was talking about me in an e-mail.

After learning of the email, SSCHI filed a defamation counter-claim against the Levines. The Levines argued, among other things, that they were not referring to SSCHI as a crook, that the claim was barred by the group libel doctrine, and that the email was substantially true. The jury found that Jonathan Levine published the email, that the email was defamatory as to SSCHI, and that the statement was false.

The Levines also brought claims against NewFirst. They asserted claims of breach of fiduciary duty, breach of contract, conversion, fraudulent inducement, negligence, and gross negligence. The thrust of these claims was that NewFirst owed the Levines a fiduciary duty and that NewFirst breached the fiduciary duty

7

when it released the draws to SSCHI. The Levines also argued that their signatures on the disbursement disclosures did not constitute proper authorization to withdraw the funds. For the third draw, the Levines asserted that they did not sign the disbursement disclosures and that their signatures were forged.

NewFirst subsequently filed a traditional and no-evidence motion for summary judgment on all of the Levines' claims against it. The trial court fully granted summary judgment on the Levines' conversion and fraud in the inducement claims against NewFirst. For the Levines' breach of contract, breach of fiduciary duty, negligence and gross negligence claims, the trial court granted summary judgment as those claims related to the first two draws but denied summary judgment on those claims as they related to the last draw.

During trial, Jonathan Levine agreed that his and his wife's claim against NewFirst was based, at least in part, on their allegation of forgery. Specifically, he testified:

Q. You and your wife have made a forgery claim, true?

A. Yeah, we didn't sign the last draw documents.

Q. Right. Draw No. 3, your claim against the bank, against NewFirst National Bank, relates to the claim that you and your wife were making that Draw No. 3 was based upon forged signatures, true?

A. Correct.

8

Later in the trial, NewFirst presented its expert on document forensics, Janet Masson, to testify to the authenticity of the Levines' signatures on the disbursement disclosure for the third draw. Masson testified that she had the highest level of assurance that the signatures on the document in question were the Levines' signatures.

Scharn testified that he and Jonathan Levine signed the last disbursement disclosure together in the construction trailer at the job site. Scharn then left the disclosure with Jonathan to take to Samantha to sign. Scharn got the disclosure back from the Levines and took it to NewFirst. In contrast, the Levines flatly denied signing the disbursement disclosures for the third draw. While not claiming to know who specifically signed their names on the document, they unequivocally stated that they did not sign them.

At the charge conference, one of the Levines' attorneys objected to the question in the charge concerning whether the signatures on the disbursement disclosure was forged. The Levines' attorney claimed that the issue of forgery was not a controlling issue and was immaterial to the outcome of the case. NewFirst argued that the Levines had asserted fraud throughout the life of the case and that, as a result, NewFirst had developed and presented its defense to this allegation, including presenting an expert witness. The trial court agreed, and submitted the

issue to the jury. The jury determined that the third disbursement did not occur as a result of forgery.

When NewFirst filed its original answer to the Levines' petition, it asserted as a counter-claim a request for sanctions against the Levines for asserting baseless claims against it. After trial, NewFirst filed a motion seeking sanctions. NewFirst argued that the trial established that the Levines' claim of forgery was baseless. The trial court agreed and awarded sanctions.

## Jury Charge

In part of their first issue, the Levines argue the trial court abused its discretion by denying their request for an instruction on a qualified privilege for SSCHI's defamation claim.

### A.    Standard of Review

We review a challenge to the trial court's jury charge under an abuse of discretion standard. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *Moss v. Waste Mgmt. of Tex., Inc.*, 305 S.W.3d 76, 81 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *Tex. Dep't of Human Servs.*, 802 S.W.2d at 649; *Moss*, 305 S.W.3d at 81. A trial court has wide discretion in submitting instructions and jury questions. *Moss*, 305 S.W.3d at 81.

**B.      Analysis**

The Levines argue that SSCHI cannot recover a judgment against them for defamation because the email was a privileged communication based on the claim that Jonathan Levine was speaking to his neighbors on a matter of common interest.   They also argue the trial court abused its discretion by denying their request for a charge instruction on the matter.

A qualified privilege to make a statement exists when the person making the statement makes it in good faith on a subject matter in which the speaker has a common interest with the other person, or with reference to which the speaker has a duty to communicate to the other.  *Saudi v. Brieven*, 176 S.W.3d 108, 118 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).   The party seeking to use the privilege has the burden to plead and prove its applicability.   *See id.* "Communications given voluntarily, rather than in response to a request for information, are privileged 'if the relationship between the parties is such that it is within generally accepted standards of decent conduct to furnish the information for the protection of the interest of the recipient.'"  *Pioneer Concrete of Tex., Inc. v. Allen*, 858 S.W.2d 47, 50 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (quoting *Kaplan v. Goodfried*, 497 S.W.2d 101, 105–06 (Tex. Civ. App.—Dallas 1973, no writ)).

11

The evidence established that the neighbors in the residential neighborhood where the construction took place were complaining to the Levines after construction had stopped. The complaints made were that the structure had become a nuisance and should be torn down. Jonathan Levine sent an email to John Hettig in response to the complaints identifying the lawsuits he was involved in concerning the residence and asserting that while Levine was "very fortunate to have had a[n] honest builder," he had "had two crooks."

The evidence establishes that Hettig was not seeking a builder for a home or seeking the Levines' opinion on any of their builders.[2] Instead, the neighbors' complaint was that the unfinished building was a nuisance. Jonathan Levine's assertion that his house was ruined by "crooks" may have served as an explanation for the circumstances giving rise to the neighbors' concerns, but it nevertheless did not propose any solution to their complaint that the unfinished house had become a nuisance. Jonathan Levine's statements about crooks, then, were voluntarily given, instead of being in response to a request for information. *See Pioneer Concrete*, 858 S.W.2d at 50.

---

[2] Jonathan Levine's own testimony established that the neighbors' complaint was that the unfinished house had become an eyesore and a nuisance. Hettig confirmed this in his response to Jonathan Levine's email, where he clarified that he was not concerned about the Levines' troubles with any builders or the Levines' opinions of their builders. Instead, Hettig maintained that his concern was about the property values of the neighborhood.

Because the statements were voluntarily given, the privilege would only apply if it was necessary to furnish the information for the protection of the interest of the recipient. *See id.* There was no proof that these statements were necessary to protect the interest of Hettig or anyone else in the neighborhood. We hold the trial court did not abuse its discretion by denying the Levines' request for an instruction on the qualified privilege of speaking on matters of common interest.

We overrule this portion of the Levines' first issue.

## Defamation

In the remaining portion of their first issue and in their second issue, the Levines argue that the evidence is legally insufficient to support the findings of liability and damages on SSCHI's defamation claim. Specifically, the Levines argue (1) the claim was submitted to the jury as libel per quod instead of libel per se, (2) recovery was barred under the group libel doctrine, (3) there is no proof of damages, and (4) SSCHI failed to disclose its method and amount of damages in response to the Levines' requests for disclosure.

### A.    Standard of Review

"The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In performing a legal-sufficiency review, we must credit favorable evidence if

reasonable fact finders could credit it and disregard contrary evidence unless reasonable fact finders could not disregard it. *Id.* "If the evidence . . . would enable reasonable and fair-minded people to differ in their conclusions, then [fact finders] must be allowed to do so." *Id.* at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id.* If the evidence allows only one inference, however, neither fact finder nor the reviewing court may disregard the inference. *Id.*

Appellants attacking the legal sufficiency of an adverse finding on an issue on which they had the burden of proof must demonstrate that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). The appellants must show that there is no evidence to support the fact finder's finding and that the evidence conclusively establishes the opposite of the finding. *See id.* In contrast, when the appellants attack the legal sufficiency of an adverse finding on an issue for which they did not have the burden of proof, they must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983).

**B.     Claim Submitted to Jury**

SSCHI asserted a counterclaim of libel against the Levines. The Levines argue that SSCHI's defamation claim was submitted to the jury as libel per quod instead of libel per se. We review the sufficiency of the evidence to support the actually submitted charge. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). The Levines argue in their brief that there is no evidence to support the jury's damage award, and they concede that this argument is premised on their contention that defamation per quod was submitted to the jury. Accordingly, it is necessary to determine what claim was submitted to the jury.

A defamatory statement is either defamatory per se or defamatory per quod. *Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013). A statement is defamatory per se when the "statements . . . are so obviously hurtful to a plaintiff's reputation that the jury may presume general damages." *Id.* "[A] statement is defamatory per se only if it falls within one of the following categories: (1) imputation of a crime; (2) imputation of a loathsome disease; (3) injury to a person's office, business, profession, or calling; or (4) imputation of sexual misconduct." *Memon v. Shaikh*, 401 S.W.3d 407, 421 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In contrast, a statement is defamatory per quod if the defamatory nature of the statement must be established by proof of innuendo or other extrinsic evidence. *Main v. Royall*,

348 S.W.3d 381, 390 (Tex. App.—Dallas 2011, no pet.). In that circumstance, the plaintiff must also present proof of injury and damages. *Id.*

Defamation per se and defamation per quod are not separate causes of action, however. "[T]he distinction between them instead is based on a rule of evidence, the difference between them lying in the proof of the resulting injury." *Downing v. Burns*, 348 S.W.3d 415, 425 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (internal quotations omitted).

The Levines argue that defamation per quod was submitted to the jury because (1) the charge did not include a question on whether the email was defamatory per se and (2) it did not instruct the jury that it could find presumed damages. In support of their argument, the Levines rely on *Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.*, 219 S.W.3d 563 (Tex. App.—Austin 2007, pet. denied).

In *Texas Disposal*, the Austin Court of Appeals held, "The issue of whether statements are defamatory per se is generally a matter of law to be decided by the court." *Id.* at 581. The matter goes to the jury only when "an ambiguity exists about the meaning and effect of the words." *Id.* The court in *Texas Disposal* determined that the meaning and effect of the statements in question was ambiguous and, for this reason, held that whether the statements were defamatory per se should have been submitted to the jury. *Id.* at 582; *see also Hancock*, 400

16

S.W.3d at 66 (holding, "[i]f the court determines that a statement is ambiguous or of doubtful import, the jury should determine the statement's meaning"). The Levines did not argue at trial that there is any ambiguity in whether Jonathan Levine's email was defamatory per se.[3] Accordingly, it would have been inappropriate to submit the issue to the jury. *See Tex. Disposal*, 291 S.W.3d at 581.

Similarly, we reject the Levines' reliance on *Texas Disposal* for their argument that failure to instruct the jury that they can presume damages converted the claim in the charge to defamation per quod. The court in *Texas Disposal* held that it was error to deny the plaintiff's request for a beneficial instruction for defamation per se. *Id.* at 584. It never held that failure to include the instruction would convert the claim to defamation per quod.

As SSCHI points out, the Fourteenth Court of Appeals has held that failure to include an instruction that general damages can be presumed does not convert the question into defamation per quod when only general damages are sought in the damage question. *Downing*, 348 S.W.3d at 425–26. The damages question at issue only included recovery for damage to reputation and damage for mental

---

[3]     The Levines argue that SSCHI was not defamed because of the group libel doctrine and because the statements were substantially true, which we address below. Neither of these arguments, however, even if correct, establishes that calling someone a crook in the context of business dealings would not be construed as defamation per se.

17

anguish. These are the type of damages for which the jury is permitted to presume damages. *See Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2002) ("Our law presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish.").

We hold the Levines have failed to establish that defamation per quod was submitted to the jury. Based on this determination, it is unnecessary for us to address their further contention that there was no evidence to support damages per quod.

## C. Group Libel

The Levines argue that SSCHI cannot recover for any statements made in Jonathan Levine's email due to the group libel doctrine. Under the group libel doctrine, a plaintiff has no cause of action for a defamatory statement directed to some of, but less than, the entire group when there is nothing to single out the plaintiff. *Harvest House Publishers v. Local Church*, 190 S.W.3d 204, 213 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Consequently, the plaintiff has no cause where the statement does not identify to which members it refers. *See id*; *see also Wright v. Rosenbaum*, 344 S.W.2d 228, 231–33 (Tex. Civ. App.—Houston [1st Dist.] 1961, no writ) (holding that the statement that "one of the four ladies"

stole a dress, without more, was not a slanderous statement to any one in particular).

In contrast, if a statement refers to all members of a small group, then individuals within that group can maintain a defamation claim. *See Sellards v. Express-News Corp.*, 702 S.W.2d 677, 680 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (holding claim of drug use and suicide construed to apply to everyone in car was actionable by one passenger); *Harvest House*, 190 S.W.3d at 214 (holding defamatory statement directed at group of individuals is actionable when statement infers all members of group participated in activity forming basis of defamation claim).

The focus of our inquiry is how the message can be perceived objectively by a reasonable person. *Harvest House*, 190 S.W.3d at 213. "[I]t is not necessary that every listener understand [the reference to the plaintiff], so long as there are some who reasonably do so." *Id.* A claim is actionable "if the language of the publication and the surrounding circumstances are such that friends and acquaintances of the plaintiff recognize that the publication is about the plaintiff" when that recognition is objectively reasonable. *Id.* at 214.

The jury determined that the email Jonathan Levine sent to Hettig was defamatory. To obtain a reversal of this finding, then, the Levines must establish

19

that, after reviewing the evidence in the light most favorable to the verdict, there is no evidence to support the adverse finding. *Croucher*, 660 S.W.2d at 58.

The subject line of Jonathan Levine's email asserted that his home was ruined by crooks ("10 Sovereign Circle- The House That Crooks Ruined."). Jonathan Levine claimed in the body of the email that he had had two crooks as builders ("I can only say that you are very fortunate to have had a[n] honest builder. We have had 2 crooks."). He further identified SSCHI as a builder, even misstating the name of the company as "Steve Scharn Custom Home *Builders*." This is sufficient evidence for the jury to conclude that a reasonable person would identify SSCHI as a subject of the defamatory statement. *See Harvest House*, 190 S.W.3d at 213–14. In fact, that is the way Hettig construed the email. *See id.* at 214 (holding claim is actionable if friends and acquaintances of plaintiff reasonably recognize publication is about plaintiff).

Additionally, the evidence establishes that the Levines hired two companies to build their home: M&A Construction and SSCHI. While both companies hired subcontractors, the jury could have reasonably determined that the email referred to the two builders hired and not any of the subcontractors. The body of the email supports this interpretation. Jonathan Levine stated that Hettig was fortunate "to have had a[n] honest builder." In this statement, Levine used the singular, which reasonably could have been understood as not including subcontractors into the

20

meaning of the term "builder." Accordingly, considering the evidence in the light most favorable to the verdict, Jonathan Levine's claim that he had "had two crooks" reasonably could have been understood to refer to the two builders he had hired and not any of the subcontractors. As a result, the statement refers to all members of a small group and is actionable. *See Sellards*, 702 S.W.2d at 680.

**D.    Substantial Truth**

The Levines argue the jury could not have found that Jonathan Levine defamed SSCHI because the email was substantially true. The Levines bore the burden at trial of establishing that the statements were substantially true. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (holding truth is affirmative defense to slander in suits between private individuals); TEX. CIV. PRAC. & REM. CODE ANN. § 73.005 (Vernon 2011) (establishing truth of statement in action for libel as a defense). Accordingly, the Levines bear the burden on appeal of establishing that there is no evidence to support the jury's finding that the statements were not substantially true and that the evidence conclusively establishes the opposite of the finding. *See Francis*, 46 S.W.3d at 241.

The Levines present two arguments for why the allegation of "crooks" was substantially true. First, the Levines argue that Jonathan Levine was thinking only

of the first builder and his subcontractor when he mentioned crooks. Second, the Levines argue that SSCHI was, in fact, a crook.

For the first argument, Jonathan Levine testified that he was only referring to the first builder and subcontractor when he wrote "crooks." He also argues that he had already obtained a judgment that included findings of fraud against the first builder and subcontractor when he wrote that email. As we have addressed above, the determination of whether a statement refers to the plaintiff is an objective test, not a subjective one. *Harvest House*, 190 S.W.3d at 213; *see also Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000) (holding "an allegedly defamatory publication should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it"). Accordingly, Jonathan Levine's testimony about what he claimed to mean when he wrote the email is not dispositive of the issue.

For the second argument, the Levines argue in their brief that SSCHI took more money than necessary in the three draws from the Levines' account. They then conclude, "that is [the] sort of things crooks do." The appropriateness of the amounts of the draws was one of the many issues disputed by the parties at trial.

Similarly, the Levines claim SSCHI changed the description for part of its charges to the Levines from "Owner distribution" to "account for Sub labor." Scharn, the owner of SSCHI, explained at trial that he had performed some work

on the home as a subcontractor and received payment for that amount. In their brief, the Levines assert, "Crooks sometimes use such creative accounting."

Conflicting evidence was presented on both of these matters. The Levines have presented no argument for why the jury had to reject SSCHI's evidence on these issues or why the Levines' evidence conclusively established the opposite of the jury's determination. *See Francis*, 46 S.W.3d at 241. We hold the Levines have failed to conclusively establish that Jonathan Levine's statements were substantially true.

### E.    Requests for disclosure on damages

The Levines argue that SSCHI was "legally precluded" from recovering on its defamation claim because SSCHI failed to disclose their method and amount of damages pursuant the Levines' request for disclosure. Rule 194.2(d) requires a plaintiff to disclose to a defendant who requests it "the amount and any method of calculating economic damages." TEX. R. CIV. P. 194.2(d). This rule only concerns economic damages. *See id.*; TEX. R. CIV. P. 194 cmt. 2. It is undisputed that SSCHI sought and obtained only non-economic damages.

We overrule the remaining portion of the Levines' first issue as well as the Levines' second issue.

## Breach of Construction Contract

In their third through eighth issues, the Levines argue (1) the evidence establishes as a matter of law that SSCHI breached the construction contract first, (2) the jury's determination that the Levines breached first is against the great weight and preponderance of the evidence, (3) the Levines are entitled to recover their damages, and (4) the Levines are entitled to recover their attorneys' fees.

### A. Standard of Review

The standard of review for the Levines' legal sufficiency arguments is the same as the standard of review stated above for defamation. To determine whether the evidence is factually sufficient to support a finding, an appellate court considers and weighs all evidence that was before the trial court. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When the appellants attack the factual sufficiency of an adverse finding on an issue on which they did not have the burden of proof, the appellants must demonstrate the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See id.* When the appellants attack the factual sufficiency of an adverse finding on which they bore the burden of proof, they must establish that the finding is against the great weight and preponderance of the evidence. *Francis*, 46 S.W.3d at 242. As the reviewing court, we may not act as fact finder and may not pass judgment on the

credibility of witnesses or substitute our judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## B.     Breach

The jury determined that both the Levines and SSCHI breached the construction contract. It also determined that the Levines breached the contract first. Accordingly, the jury awarded damages and attorneys' fees to SSCHI but not to the Levines. The Levines challenge all of these findings. We start with who breached first. *See Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.").

A party is excused from further performance of a contract only when the breach by the other party is material. *Id.* When a breach is immaterial, the non-breaching party is not excused from future performance but may sue for the damages caused by the breach. *Harris Cnty. Util. Dist. No. 16 v. Harris Cnty. Mun. Dist. No. 36*, No. 01-10-00042-CV, 2011 WL 3359698, at *9 (Tex. App.—Houston [1st Dist.] Aug. 4, 2011, no pet.) (citing *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994)). Whether a party's breach of contract is so material as to render the contract unenforceable is a question of fact to be

determined by the trier of fact. *See Henry v. Masson*, 333 S.W.3d 825, 835 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

It is undisputed that, on January 4, 2008, the Levines formally terminated the contract. If the jury reasonably could have determined that SSCHI did not breach the contract before this date, then the jury reasonably could have determined that the Levines breached first. The Levines present two major arguments for how SSCHI breached first: by failing to provide receipts and by failing to build according to the plans.

The Levines rely on the Builders and Mechanics Lien Contract to establish that SSCHI was required to provide receipts.[4] The relevant portion of the lien contract provides,

> [SSCHI] shall furnish [the Levines] proper receipts and releases from any and all materialmen from whom any material is obtained by [SSCHI] for use in said improvements, and from all sub-contractors, as well as from each and all the workmen who have worked thereon, to the end that no liens may be fixed upon said premises save and except the express liens herein created.

Before November 28, 2007, SSCHI had not provided any receipts to the Levines. On November 28, the Levines' attorney wrote a demand letter to SSCHI requesting receipts. SSCHI provided them on December 11.

---

[4] The parties dispute, at trial and on appeal, whether the Levines properly pleaded a breach of contract claim for this contract. Because we hold that any such breach is immaterial, we do not need to reach whether the claim was properly pleaded.

The Builders and Mechanics Lien Contract in general, and this provision in particular, concern the creation of liens on the property. The evidence at trial established that only one lien was filed on the property, that that lien was filed by mistake, and that the lien was removed as soon as the error was brought to the attention of the party that filed the lien. Given this, we hold the jury reasonably could have determined that any breach by SSCHI's failure to provide the Levines receipts before December 11 was not a material breach. The Levines argue the breach was material because there was no back-up for the draw requests that SSCHI submitted to NewFirst. As we have noted, however, the requirement for receipts concerned avoidance of liens on the property, and the contract does not make the transmission of the receipts a precondition for making draws from the bank.

The Levines also claim that SSCHI breached first by failing to build according to the plans. The Levines complain that SSCHI "bought unpainted steel and . . . torch cut and field weld[ed] it on site" instead of using "engineered steel." SSCHI argues that the Levines have failed to establish that SSCHI had a contractual obligation to use painted steel. We agree. *See Manon v. Solis*, 142 S.W.3d 380, 391 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (holding appellate court has no duty to search voluminous record without sufficient

guidance from appellant to determine whether assertion of reversible error is valid).

For the difference between torch cut and field welded steel versus engineered steel, we hold the Levines have failed to establish that the difference is material. One portion of the record the Levines rely on to establish materiality is the testimony of a civil engineer, Hachem Domloj. Domloj testified that "nothing was constructed as per the plans." He testified that the engineered steel was important because of precision. "[W]hen you specify the steel with the connections and, you know, you go with the dimensions to the one-eighth or the one-sixteenth, and you cannot do that on the site."

Even assuming the jury was compelled to accept this testimony as true, there is no evidence of what level of deviation the field-welded steel had compared to the one-eighth to one-sixteenth inch precision of engineered steel. In addition, there is no testimony on how any such deviation in the field-welded steel would have had any significant effect on the remaining construction or on the integrity or aesthetics of the completed structure.

The Levines also complain about the manner in which SSCHI welded the beams together, concerning the proper use of "moment connections." Here, the Levines presented testimony from witnesses about why the difference was

significant. The main complaint was that the type of connection was not the type depicted in the drawings.

SSCHI offered proof that the contract required SSCHI "to build the house in *general accordance* with the plans and specifications by the Architect" and that SSCHI could "make such changes or substitutions in the construction of the residence as . . . [SSCHI] may deem appropriate so long as the materials of equal or better quality are used; however, any amendments thereof, or changes and variations therein must be in substantial conformity with the plans and specifications by Architect." (Emphasis added.) SSCHI also points to testimony in the record that the beam connections used by SSCHI "can be just as strong as or stronger than bolted connections." There was also testimony and photographs establishing that, when the structure was subsequently demolished, the beams were torn apart to fit in the dumpster, but the welding held.

It is the province of the jury to resolve conflicting evidence, to determine the credibility of the witnesses, and to weigh their testimony. *See City of Keller,* 168 S.W.3d at 819; *Mariner Health Care of Nashville, Inc. v. Robins*, 321 S.W.3d 193, 210 (Tex. App.—Houston [1st Dist.] 2010, no pet.). We hold that the Levines have failed to establish that the jury could not have made credibility determinations in favor of SSCHI and against the Levines on this matter or that the jury could not have resolved the conflicting evidence in favor of SSCHI.

The Levines also presented testimony that the way the beams were connected raised the porte cochere by six inches (from 26.5 feet to 27 feet) and changed the "slenderness ratio." The Levines do not provide, however, any explanation of how such changes were material breaches. While a six-inch variation in height is not inherently immaterial, we hold that—without an explanation of how such a variation or the change in the slenderness ratio was material—the jury was not compelled to conclude that it was material.

Finally, the Levines argue that "a 55 foot long 24 inch tall steel 'I' beam was either sagging by about an inch or it was designed as a 'cambered' beam and installed upside down." Given that there were two possibilities, the Levines have failed to establish why the jury could not determine that the beam was sagging by one inch and that this was immaterial.

We hold the jury reasonably could have rejected all of the bases that the Levines claim on appeal prove that SSCHI breached before the Levines terminated the contract. Accordingly, we hold the evidence is legally and factually sufficient to support the jury's findings on this issue.

## C. Damages

The Levines argue they are entitled to recover all the money they paid to SSCHI as damages and that SSCHI could not recover more than $52,000 in damages. For their claim that they were entitled to recover all the money they paid

to SSCHI as damages, we have already upheld the jury's determination that the Levines breached first. *See Mustang Pipeline*, 134 S.W.3d at 196 (holding prior material breach by one party excuses further performance of other party). We have also held that the jury could have reasonably determined that the alleged contractual breaches that the Levines assert that SSCHI committed before their breach were immaterial. Nevertheless, a party can still recover damages for immaterial breaches. *See Harris Cnty. Util. Dist. No. 16*, 2011 WL 3359698 at *9 (citing *Hernandez*, 875 S.W.2d at 693). The Levines did not establish at trial, however, any damages specific to these alleged breaches. Instead, the Levines argued that all of "[t]he work done had no value." Accordingly, there was no basis for the jury to award damages for these alleged breaches.

For the Levines' claim that SSCHI could not recover more than $52,000 in damages, the record establishes that the Levines submitted requests for disclosure to SSCHI, including the request to identify the amount and method of calculating economic damages. *See* TEX. R. CIV. P. 194.2(d). In its response, SSCHI stated it was seeking "approximately $52,000" in damages. The Levines claim that SSCHI was "precluded as a matter of law" from recovering any amount greater than $52,000.

The Levines rely on rule 193.6 of the Texas Rules of Civil Procedure as authority that SSCHI was precluded from a greater recovery as a matter of law.

Rule 193.6 provides, "A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed" unless certain requirements are met. TEX. R. CIV. P. 193.6(a).

The admission or exclusion of evidence is left to the discretion of the trial court. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). In order to preserve any error in the admission of evidence, the complaining party must raise an objection and obtain a ruling. TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a). This applies to any evidence that could be excluded under rule 193.6. *City of Paris v. McDowell*, 79 S.W.3d 601, 606–07 (Tex. App.— Texarkana 2002, no pet.).

The Levines have failed to cite to any portion of the record establishing that they raised any objection to evidence of SSCHI's damages in excess of $52,000. Accordingly, they have failed to establish that this issue was preserved for appeal.

## D. Attorneys' Fees

The Levines argue that they are entitled to attorneys' fees because the jury found that SSCHI breached the contract and made a determination of what the Levines' damages would have been. The contract between the Levines and SSCHI provided, "If any claim or litigation is commenced by the parties concerning any

provision of this Contract, the prevailing party or parties shall be entitled . . . to a reasonable sum for their attorney's fees incurred in the claim or litigation process."

In order to be a "prevailing party," the party must have received "relief that materially altered the parties' legal relationship." *Epps v. Fowler*, 351 S.W.3d 862, 868 (Tex. 2011) (citing *Intercontinental Grp. P'ship v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 652 (Tex. 2009)). In *KB Home*, although the jury had found in favor of KB Home on liability, it had also found the damages to be zero. 295 S.W.3d at 652. As a result, KB Home was not a prevailing party.

Here, the Levines did not obtain a favorable finding on liability. The jury found that SSCHI, like the Levines, had failed to comply with the terms of their contract. Unlike the Levines, however, the jury also determined that SSCHI's failure to comply was excused. Accordingly, the Levines did not prevail simply by a finding that SSCHI had failed to comply with the agreement. *See id.*

We overrule the Levines' third through eighth issues.

### Summary Judgment on Claims Against NewFirst

In their ninth issue, the Levines argue the trial erred by granting summary judgment on their claims of breach of fiduciary duty and breach of contract against NewFirst. NewFirst argues these issues have been waived.

## A.  Standard of Review

The summary-judgment movant must conclusively establish its right to judgment as a matter of law.  *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). Because summary judgment is a question of law, we review a trial court's summary judgment decision de novo.  *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

To prevail on a "traditional" summary-judgment motion, asserted under Rule 166a(c), a movant must prove that there is no genuine issue regarding any material fact and that it is entitled to judgment as a matter of law.  *See* TEX. R. CIV. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice*, 148 S.W.3d 374, 381 (Tex. 2004).  A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence.  *See City of Keller*, 168 S.W.3d at 816.  A defendant moving for traditional summary judgment must either (1) disprove at least one element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of an affirmative defense to rebut the plaintiff's cause.  *Am. Tobacco Co, Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997).

After an adequate time for discovery, a party may move for no-evidence summary judgment on the ground that no evidence exists of one or more essential elements of a claim on which the adverse party bears the burden of proof at trial.

TEX. R. CIV. P. 166a(i); *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 834 (Tex. App.—Houston [1st Dist.] 1999, no pet.). The burden then shifts to the non-movant to produce evidence raising a genuine issue of material fact on the elements specified in the motion. TEX. R. CIV. P. 166a(i); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The trial court must grant the motion unless the non-movant presents more than a scintilla of evidence raising a fact issue on the challenged elements. *Flameout Design*, 994 S.W.2d at 834; *see also Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (holding "[m]ore than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions").

To determine if there is a fact issue, we review the evidence in the light most favorable to the non-movant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding*, 289 S.W.3d at 848 (citing *City of Keller*, 168 S.W.3d at 827). We indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). When the trial court's summary judgment order does not state the basis for the trial court's decision, we must uphold the order if any of the theories advanced in the motion

are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

**B.    Waiver**

The Levines asserted claims of breach of fiduciary duty, breach of contract, conversion, fraudulent inducement, negligence, and gross negligence against NewFirst.  NewFirst subsequently filed a traditional and no-evidence motion for summary judgment on all of the Levines' claims.  The trial court fully granted summary judgment on the Levines' conversion and fraud in the inducement claims.  For the Levines' breach of contract, breach of fiduciary duty, negligence and gross negligence claims, the trial court granted summary judgment as those claims related to the first two draws but denied summary judgment on those claims as they related to the last draw.

On appeal, the Levines challenge the trial court's ruling on their breach of fiduciary duty and breach of contract claims.  NewFirst argues that the Levines waived all their complaints about the trial court's grant of summary judgment on their fraud in the inducement and conversion claims. In particular, NewFirst contends that complaints concerning the first two draws were waived because the Levines had four claims relating to those draws but have not identified on appeal which of the four claims they are seeking reversal on.  The Levines' brief argues extensively that the trial court erred by granting summary judgment because

NewFirst owed them a fiduciary duty and because they did not properly authorize the withdrawals. It contains citations to legal authority and to the record for the matters asserted. In their reply brief, the Levines clarify that they are seeking reversal of the summary judgment on their breach of fiduciary duty and breach of contract claims. To the degree there was any ambiguity in their brief on the merits, the Levines have rectified it in their reply brief. We hold that any such ambiguity is insufficient to result in waiver of the issues raised and argued in their brief on the merits. *See* TEX. R. APP. P. 38.9 (requiring substantial compliance to acquaint court with argument and proper authority).

## C.    Breach of Fiduciary Duty

The loan agreement between the Levines and NewFirst provided that one of the prerequisites to NewFirst authorizing the loan was that the Levines had to open an account with NewFirst and deposit $814,990.35 in the account. The loan agreement provided that the deposited amount would be used to pay for the costs of construction of the home. Only once the deposited amount was fully dispersed would NewFirst issue any funds under the loan agreement.

When the account was opened, NewFirst placed a hold on the account, which prevented the Levines from withdrawing money from the account for any purposes other than the construction of the home. The agreement creating the NewFirst bank account provided that one signature was required for a withdrawal.

37

Three draws were ultimately made on the deposited amount. Construction of the home stopped before the deposited amount was fully dispersed and before any money was issued under the loan.

For their breach of fiduciary duty claim, the Levines argued that the account in which they deposited $814,990.35 was a special deposit, which gave NewFirst a fiduciary duty in managing the account and releasing funds. The Levines argue that NewFirst breached this fiduciary duty by not getting receipts and by failing to obtain either of the Levines' signatures for a withdrawal authorization. NewFirst argued in its motion for summary judgment that the Levines' money was not a special deposit and that, accordingly, NewFirst did not owe the Levines any fiduciary duties.

The Levines rely on their argument that a special deposit was created as the ground for their claim that NewFirst owed them a fiduciary duty. A deposit with a bank can be a general deposit or a special deposit. *See Hudnall v. Tyler Bank & Trust Co.*, 458 S.W.2d 183, 186 (Tex. 1970); *Lee v. Gutierrez*, 876 S.W.2d 382, 384–85 (Tex. App.—Austin 1994, writ denied) (citing *Hudnall*). If money is deposited without any special agreement, it is a general deposit. *Hudnall*, 458 S.W.2d at 186. In that circumstance, the bank becomes the owner of the money, the funds are mingled with the bank's other funds, and the relationship between the bank and the depositor is a relationship of debtor (the bank) and creditor (the

depositor). *Id.* In contrast, if money is deposited with an agreement that the money "shall be paid out for a specific purpose," it is a special account. *Id.* In that circumstance, the fund is a trust fund, the bank does not acquire title to the money, and the bank becomes a trustee for the disbursement of the money according to the agreement under which the deposit was made. *Id.* When a trustee relationship is created, a fiduciary duty arises as a matter of law. *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005).

The Levines were required to deposit money into a NewFirst account as a prerequisite to obtaining the necessary loan. The money deposited would be used only to pay for the costs of construction for the Levines' home. A hold was placed on the account to prevent the Levines from withdrawing the money for any other purpose. This is some indication that the parties intended the money deposited with NewFirst to be a special deposit.

As NewFirst argues, however, this intent was disclaimed by the loan agreement. One of the specific conditions of the loan agreement was that the Levines deposit this money with NewFirst and that the money only be used to pay for the costs of construction of their home. One document in the set of documents constituting the loan agreement provides,

> The relationship between Borrower [i.e., the Levines] and Lender [i.e., NewFirst] is solely that of borrower and lender, and Lender has no fiduciary or other special relationship with Borrower. No term or condition of the Loan Documents shall be construed so as to deem the

relationship between Borrower and Lender to be other than that of the borrower or lender.

The deposit is a condition of one of the loan documents. Accordingly, the parties agreed that, regardless of the typical circumstances for a special deposit, no fiduciary relationship would be created in this situation.

The Levines also argue that, while it was "not an 'escrow agent' in the formal sense, NewFirst was a fiduciary with the duties that position entails." The Levines rely on a portion of a document that is a proposal for the general terms of the loan agreement. Even assuming this document was a part of the loan agreement, the agreement explicitly disclaims any interpretation of the loan agreement that creates a fiduciary duty. *See Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 702 (Tex. 2007) (holding fiduciary duties are equitable in nature, not subject to "hard and fast rules," and should be considered in light of parties' written contract).

We hold the trial court did not err by granting summary judgment on the Levines' breach of fiduciary duty claim for the first two draws. The Levines also argue in their brief that, because the trial court failed to recognize the fiduciary relationship between the parties, there was error in certain questions that went to the jury on the Levines' remaining claims against NewFirst. Because we have held there was no fiduciary relationship between the parties, this argument necessarily fails.

40

**D. Breach of Contract**

For their breach of contract claim, the Levines argued that NewFirst was required to obtain a signed authorization for withdrawal from at least one of the Levines before it could release money to SSCHI. They argue that, by failing to obtain the required signature, NewFirst breached the deposit agreement requiring the signature.

NewFirst argued in its motion for summary judgment that it, in fact, had obtained the requisite signature of the Levines. Before it requested each draw on the Levines' bank account from NewFirst, SSCHI presented the Levines with a Contractor's Disbursement Disclosure for Residential Construction. Each disbursement disclosure provided, "The following is the information required to be provided under the Texas Property Code in connection with this payment request on the above-described project." *See* TEX. PROP. CODE ANN. § 53.258(a) (Vernon 2007). Near the bottom of the page, the document identifies the date it was received by the Levines and, below that, contains the signatures of the Levines.

The Levines were also presented with a similar document, entitled Lender's Disbursement Disclosure for Residential Construction. This disclosure likewise provided, "The following is the information required to be provided under the Texas Property Code in connection with a payment request on the above-described

41

project." *See id.* § 53.258(b). It also identifies the date it was received by the Levines and, below that, contains the signatures of the Levines.

NewFirst argues these signatures from the Levines constitute the required signatures. It has been established that the purpose of the account was to pay for the costs of construction of the Levines' home. SSCHI presented the Levines with a disbursement disclosure giving notice that it was going to seek a draw on the account, detailing the bills to be paid with the money drawn. The Levines signed the construction disbursement disclosure. NewFirst then presented the Levines with notice that it had disbursed the money to SSCHI, and the Levines signed this as well. The Levines were aware of at least the first two draws and, at the time, did not complain about any failure to obtain the proper signatures for withdrawal.

The Levines have established the requirement in the deposit agreement that one of their signatures is required for a withdrawal from the account. But this does not establish that their signatures on the disbursement disclosures cannot satisfy that requirement. The Levines also point to a statement by NewFirst that Shirley was the one to authorize the withdrawals. This statement comes from a response from NewFirst to an interrogatory submitted by the Levines. The interrogatory instructs NewFirst to "[i]dentify each and every Bank employee who authorized a withdrawal" from the Levines' account. NewFirst identified Shirley as the bank employee that authorized the withdrawal. The Levines' interrogatory was

specifically limited to identifying bank employees. Nothing in this interrogatory suggests that NewFirst was asserting it acted without the required signatures. To the contrary, Shirley testified in his deposition that the signatures on the disbursement disclosures are what gave him authority to release the money.

The Levines also argue that NewFirst never compared the Levines' signatures on the disbursement disclosures against their signatures on file, that they never signed a check, that NewFirst never emailed them seeking authority or informing them of any disbursement. The Levines have provided no authority that any of these actions were necessary to authorize release of the funds.

We hold the trial court did not err by granting summary judgment on the Levines' breach of contract claim for the first two draws. We overrule the Levines' ninth issue.

**Sanctions**

In their tenth issue, the Levines argue the trial court abused its discretion by awarding sanctions against them in favor of NewFirst.

## A. Standard of Review & Applicable Law

We review a trial court's imposition of sanctions for an abuse of discretion. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). A trial court abuses its discretion in imposing sanctions when it acts "without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable." *Id.* When reviewing

matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

We presume that pleadings are filed in good faith. *Low*, 221 S.W.3d at 614. The party seeking sanctions bears the burden of overcoming this presumption. *Id.* In reviewing the sanctions order, we review the entire record to determine whether the trial court abused its discretion. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (per curiam). The trial court may consider everything that has occurred during the history of the litigation when determining how to sanction a party. *Berry–Parks Rental Equip. Co. v. Sinsheimer*, 842 S.W.2d 754, 757 (Tex. App.—Houston [1st Dist.] 1992, no writ); *see also Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985).

NewFirst sought the imposition of sanctions against the Levines under both rule 13 of the Texas Rules of Civil Procedure and chapter 10 of the Texas Civil Practice and Remedies Code. Rule 13 permits sanctions against attorneys and represented parties who file a groundless pleading in bad faith or for the purpose of harassment. TEX. R. CIV. P. 13; *R.M. Dudley Constr. Co. v. Dawson*, 258 S.W.3d

694, 707 (Tex. App.—Waco 2008, pet. denied). The party seeking to impose sanctions pursuant to Rule 13 must demonstrate first that the opposing party's pleadings are groundless; then the party must demonstrate that the groundless pleadings were either filed in bad faith or filed for the purpose of harassment. *Dawson*, 258 S.W.3d at 707. A pleading is "groundless" if it has "no basis in law or fact and [is] not warranted by good faith argument for the extension, modification, or reversal of existing law." Tex. R. Civ. P. 13; *Dawson*, 258 S.W.3d at 708.

### B. Assertion of Forgery Claim

The Levines argue on appeal that they "did not sue NewFirst for forgery." We disagree. The facts section of the Levines' live petition provides that they "specifically allege that they did not consent nor sign off on draw number three, the receipt for purported draw number and that their signatures thereon were forged." While they did not use the word forgery in any of their stated claims against NewFirst, the Levines did assert that they did not authorize the withdrawals.

During trial, Jonathan Levine testified as follows:

Q. You and your wife have made a forgery claim, true?

A. Yeah, we didn't sign the last draw documents.

Q. Right. Draw No. 3, your claim against the bank, against NewFirst National Bank, relates to the claim that you and your

45

wife were making that Draw No. 3 was based upon forged signatures, true?

A. Correct.

Later in the trial, NewFirst presented its expert on document forensics, Janet Masson, to testify to the authenticity of the Levines' signatures on the disbursement disclosure for the third draw. Masson testified that she had the highest level of assurance that the signatures on the document in question were the Levines' signatures. The Levines' attorney made no objection to the relevance of the testimony and cross-examined Masson on the validity of her opinion.

At the charge conference, one of the Levines' attorneys objected to the question in the charge concerning whether the signatures on disbursement disclosure was forged. At that point, the Levines' attorney claimed that the issue of forgery was not a controlling issue and was immaterial to the outcome of the case. NewFirst argued that the Levines had asserted fraud throughout the life of the case and that, as a result, NewFirst had developed and presented its defense to this allegation, including presenting an expert witness.

Even if we take the Levines' attorney's statement during the charge conference as abandoning their assertion of forgery on the third draw as a ground supporting their claims for relief, the record establishes that the Levines were relying on forgery as a ground supporting their claims for relief up until that point. We hold NewFirst could seek sanctions on a ground asserted in support of the

Levines' claim that the Levines asserted throughout the litigation, that was developed through discovery, and that was asserted at trial.

## C.    Sanctions Award

The trial court determined that the Levines' claim of forgery against NewFirst was "frivolous, brought in bad faith, and for the purpose of harassing" NewFirst.  The trial court further determined that the allegation of forgery "was a fiction" and that the Levines' testimony at trial underscored the determination that the claim was brought in bad faith.  We review this determination for an abuse of discretion.  *See Low*, 221 S.W.3d at 614 (holding appellate courts review sanctions award for abuse of discretion); *Falk & Mayfield L.L.P v. Molzan*, 974 S.W.2d 821, 827–28 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (holding trial court has broader discretion in awarding sanctions for groundless pleadings).  Lying about a ground supporting a party's claim is sanctionable conduct.  *See Income Adm'r Servs., Inc. v. Payne*, No. 03-01-00283-CV, 2002 WL 220038, *2, 5 (Tex. App.—Austin Feb. 14, 2002, pet. denied) (upholding award of sanctions based on determination that plaintiff lied about "critical allegation" supporting claims).

At trial, the Levines flatly denied signing the disbursement disclosures for the third draw.  While not claiming to know who specifically signed their names on the document, they unequivocally stated that they did not sign them.  The jury similarly heard that the Levines also denied signing documents in support of the

second draw, despite having previously admitting the authenticity of their signatures in deposition testimony. Against this conflicting evidence about which signatures the Levines were admitting and which they were challenging as forged, Scharn testified that he and Jonathan Levine signed the last disbursement disclosure together in the construction trailer at the job site. Scharn then left the disclosure with Jonathan to take to Samantha to sign. Scharn got the disclosure back from the Levines and took it to NewFirst. Masson, an expert in verifying the authenticity of signatures testified that she had the highest level of certainty that both of the Levines' signatures were authentic.

The Levines complain about the trial court's assertion that sanctions could be "awarded for clearly a matter that should have been resolved prior to this matter starting trial, and that's whether they were forgeries or not." The Levines argue in their brief that "[r]esolving factual matters is what trials are for." This is more than just a factual dispute between the parties, however.

The Levines flatly denied signing the disbursement disclosure for the third draw. Yet the jury concluded that they did not carry their burden to prove, by a preponderance of the evidence, that the signatures were forged. The trial court reached a similar conclusion based on the same set of facts and determinations of credibility. In making this determination, the trial court did not simply decide in favor of one party over the other on how to interpret facts or whose memory of

events was more likely correct. Instead, the trial court determined that the Levines did in fact sign the document in question. In support of the sanctions order, the trial court expressly found:

1. Plaintiffs' forgery claims against NewFirst were sanctionable because they were frivolous, brought in bad faith, and for the purpose of harassing the Defendant.

2. Plaintiffs' testimony in depositions and at trial in regard to the forgery allegations underscored the fact that Plaintiffs' pleadings and affidavits against the bank were brought in bad faith, solely for the purpose of harassing NewFirst.

3. There is a direct relationship between the sanction and the Plaintiffs' offensive conduct. Due to the frivolous claims of forgery, NEWFIRST NATIONAL BANK was caused to incur $25,000.00 in attorney's fees, and $2,550.00 in expert witness expenses that otherwise would not have been incurred. NEWFIRST NATIONAL BANK was forced to hire counsel to respond to the frivolous pleadings, engage in ongoing discovery and motion practice, and defend itself in an eleven-day trial. For these reasons, the sanction is also no more severe than necessary.

4. There is good cause to support the imposition of sanctions because Plaintiffs pleadings and testimony in regard to the forgery allegations were frivolous and brought in bad faith. Plaintiffs' lawsuit against NewFirst was based on the allegation of forgery as to Draw No. 3; however, *the allegation of forgery was a fiction*, which became clear during the trial of this case.

(Emphasis supplied.) As indicated by its findings, the trial court determined that, rather than being confused or having simply forgotten (a possibility that even the Levines rejected), the Levines lied—both in their pleadings and at trial. The

49

Levines have presented no argument for why the trial court could not have made this determination, and we find none.

The Levines also argue that, during the hearing on the motion for sanctions, the trial court exhibited some confusion about the evidence from the trial. Because we have held there is evidence to support the trial court's ruling, any other potential confusion is irrelevant to our analysis. *See Donalson v. Barr*, 86 S.W.3d 718, 720 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding trial court cannot abuse its discretion if it reaches correct result even for wrong reason); *Chenault v. Banks*, 296 S.W.3d 186, 190 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (same).

The Levines also argue that the trial court's findings in its sanctions award "do[] not sufficiently particularize the basis for the ruling." *See* TEX. R. CIV. P. 13 (requiring sanction order to state particulars of good cause supporting sanctions). The Levines have not established that they raised any objection to this alleged error. A party against whom sanctions are awarded waives any error in the order's failure to identify good cause if the party fails to object to the form of the sanctions order. *Robson v. Gilbreath*, 267 S.W.3d 401, 407 (Tex. App.—Austin 2008, pet. denied). In such case, the appellate court reviews the record for support for implied findings. *Id.* Because this objection was not raised before the trial court, the Levines have waived any error in any in the order's findings.

We overrule the Levines' tenth issue.

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Justice Keyes, dissenting in part.