**Opinion issued October 15, 2020**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-19-00372-CV**

———————————

**PRIME TEXAS SURVEYS, LLC, Appellant**

**V.**

**TIM ELLIS, Appellee**

**On Appeal from the County Civil Court at Law No. 4**
**Harris County, Texas**
**Trial Court Case No. 1069679**

**MEMORANDUM OPINION**

Appellant, Prime Texas Surveys, LLC ("Prime Texas") challenges the trial

court's judgment, entered after a jury trial, in favor of appellee, Tim Ellis, in his suit

against Prime for breach of contract, violations of the Texas Deceptive Trade

Practices Act ("DTPA"), and fraud. In four issues, Prime Texas contends that the evidence is legally and factually insufficient to support the DTPA findings against it.[1] Prime Texas also contends that Ellis's DTPA claim is barred by the "Economic Loss Rule." We affirm.

## BACKGROUND

Ellis hired Prime Texas to complete a survey and replat of his property. At trial, the parties stipulated to the terms of their agreement as follows:

> In October 2014, Ellis and Prime Texas entered an agreement for survey and replatting services for the Property. The terms of the agreement were as follows: (i) Ellis agreed to pay $8,485.06 to Prime Texas, payable in two installments; (ii) Prime Texas would complete a survey of the Property and then obtain and file a City Planning Letter for the City of Houston to complete the replatting of the Property.
>
> Ellis paid the first installment of $4,242.53 to Prime Texas for Prime Texas to complete a survey of the Property.
>
> Ellis received a survey of the property that was completed by Prime Texas. Prime Texas also secured and filed a City Planning Letter.

Once the survey and City Planning Letter were completed, Arthur Urialdes[2] contacted Ellis about the second payment. Alberto Alaniz, Prime Texas's owner,

---

[1] Prime actually challenges all of the findings against it, including those on the breach-of-contract and fraud causes of action. However, Ellis elected to recover on his DTPA claim. Thus, if the DTPA findings are legally and factually sufficient, we need not address the findings on the other causes of action. *See* TEX. R. APP. P. 47.1.

[2] Urialdes's name is spelled several ways in the appellate record and briefs. For purposes of this opinion, we will use the spelling in the trial court's jury charge.

2

testified that Urialdes "was our replat guy." It is undisputed that Urialdes was an employee of Prime Texas from February 12, 2014 until he was terminated in April 2015. And, in response to a request for admission, Prime Texas admitted that Urialdes had "apparent authority" and "was authorized to act of behalf of [Prime Texas] during all of his meetings and interactions with Ellis."

In February 2015, Ellis met with Urialdes in the conference room at Prime Texas, where Urialdes told Ellis that he needed the second payment before he could complete the replat. Urialdes asked Ellis to give him a check for $5,442.53 (which was $1,200.00 more than the balance due). Urialdes also asked Ellis to leave the payee line blank, explaining that Prime Texas was running behind on replats and would likely have a subcontractor finish the job. Despite some trepidation, Ellis did as Urialdes requested.

Sometime later, Jose Trevino, Prime Texas's Director of Operations, called Ellis to ask about the status of the replat because he knew that it was unfinished. Ellis told Trevino that he had already tendered the second payment to Urialdes at Prime Texas. Prime Texas refused to complete the replat unless Ellis made the second payment again. At trial, Trevino testified that Prime Texas never completed the replat because "we didn't get paid."

Trevino, apparently aware that Urialdes was now conducting replats through his own business, put Ellis in touch with Urialdes. For a while, Ellis thought that

3

Urialdes was going to complete the replat, but when he did not, Ellis returned to Prime Texas, explaining that he had already paid and requesting that it finish the replat. Again, Prime Texas claimed that it had not been paid, but referred Ellis to other contractors who it said would complete the replat, but only if Ellis paid additional money.

Around the same time period that Ellis met with Urialdes at Prime Texas and tendered the second payment, Urialdes had started his own business, City Plats, and began diverting replatting business from Prime Texas by telling its customers that City Plats was a "sister company" to Prime Texas. This was in violation of Urialdes's employment agreement with Prime Texas, so, in April 2015, Prime Texas fired Urialdes. In May 2015, Prime Texas sued Urialdes, alleging breach of contract, tortious interference with existing contracts, breach of fiduciary duty, and theft. Prime Texas recovered a judgment against Urialdes for $21,000. Its damages calculation for the jury in that case included the approximate $5,000.00 that Ellis had given Urialdes. At trial, Trevino testified that, if the company ever collected on its judgment against Urialdes, it would give Ellis his money back.

After Prime Texas refused to complete Ellis's replat without receiving his second payment again, Ellis filed suit against Prime Texas alleging breach of contract, violations of the DTPA, and fraud. The jury found against Prime Texas on all causes of action, and Ellis elected to recover on his DTPA claims. The trial court

4

entered a final judgment awarding Ellis: (1) $9,685.06 in economic damages, (2) $20,000 for DTPA conduct that was committed knowingly, and (3) pre- and post-judgment interests and costs.

## SUFFICIENCY OF THE EVIDENCE

In four issues on appeal, Prime Texas contends that the evidence is legally and factually insufficient to support the jury's findings that: (1) Urialdes acted within the "course and scope" of his employment as an employee of Prime Texas; (2) Prime Texas violated the DTPA; (3) Prime Texas acted "knowingly" in violating the DTPA, and (4) Ellis suffered compensable damages.

### *Standard of Review*

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, he must demonstrate that no evidence supports the finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). We will sustain a legal sufficiency or "no-evidence" challenge if the record shows any one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, we consider the evidence

5

in the light most favorable to the verdict and indulge every reasonable inference that supports it. *Id.* at 822.

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (internal quotations omitted). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within th[e] zone of reasonable disagreement." *Id.*

When an appellant challenges the factual sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 653 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). In conducting a factual-sufficiency review, we examine, consider, and

6

weigh all the evidence that supports or contradicts the fact finder's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We note that the jury is the sole judge of the witnesses' credibility, and a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). When presented with conflicting testimony, the fact finder may believe one witness and disbelieve others, and it may resolve inconsistencies in the testimony of any witness. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). We set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

### *Course and Scope of Employment*

Having found against Prime Texas on two predicate DTPA questions,[3] the jury was asked the following question:

> On the occasion(s) in question, was Arthur Urialdes acting within his scope of employment as an employee of Prime Texas?

---

[3] In jury question no. 3, the jury was asked whether Prime Texas engaged in "any false, misleading, or deceptive act or practice that Ellis relied on to his detriment and that was a producing cause of damages to Ellis." In jury question no. 4, the jury was asked whether Prime Texas engaged in "any unconscionable action or course of action that was a producing cause of damages to Ellis." The jury answered both questions, "Yes."

"Scope of employment" means an activity of any kind or character that has to do with and originates in the work, business, trade, or profession of the employer and that is performed by the employee while engaged in or about the furtherance of the affairs or business of the employer.

Intentional or malicious acts committed by an employee that are unforeseeable considering the employee's duties are not within the "scope of employment."

The jury responded, "Yes."

In issue one, Prime Texas contends that it cannot be vicariously liable for Urialdes's DTPA misrepresentations or unconscionable course of action because "[t]he evidence is legally and factually insufficient to support the jury finding that Urialdes acted in the course and scope of employment as an employee of Prime Texas."

Prime Texas argues that "[e]ssentially Urialdes *stole from Ellis* monies which were to have been paid to Prime Texas" and that theft from a client was outside the scope of Urialdes's employment. (Emphasis added). However, Prime Texas's position rests on the false premise that Urialdes stole the money from Ellis, not from Prime Texas. This is not the case. A theft occurs when (1) property is (2) unlawfully appropriated (3) by someone (4) with intent to deprive the owner of that property. TEX. PENAL CODE § 31.03. A theft is complete when all the elements have occurred. *Anderson v. State*, 322 S.W.3d 401, 408 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). When it is alleged that theft of money occurred, but the evidence shows theft of a check, there must be evidence that the check was endorsed,

8

cashed or negotiated. *Johnson v. State*, 560 S.W.3d 224, 235 (Tex. Crim. App. 2018) (Yeary, J., concurring). Here, the money was not stolen until Urialdes wrote his name on the check and deposited it, all of which occurred after Ellis tendered the payment to Prime Texas.

Ellis contends that Urialdes was authorized to receive his payment on behalf of Prime Texas, that Urialdes did so, and that the fact that Urialdes subsequently converted the check to his own use did not show that he was unauthorized to receive the payment on behalf of Prime Texas and was acting outside the scope of his employment when he did so. We agree with Ellis.

To show an employee acted within the course and scope of his employment, the plaintiff must demonstrate the conduct occurred (1) within the general authority given the employee, (2) in furtherance of the employer's business, and (3) for the accomplishment of the object for which the employee was employed. *Mata v. Andrews Transp., Inc.,* 900 S.W.2d 363, 366 (Tex. App.—Houston [14th Dist.] 1995, no writ); *see also Leadon v. Kimbrough Bros. Lumber Co.,* 484 S.W.2d 567, 569 (Tex. 1972).

### *Urialdes's General Authority*

The issue presented in this element is essentially whether Urialdes had actual or apparent authority to deal with Ellis regarding payments for the contracted-for

replat.[4] Prime Texas admitted in a Request for Admissions that he did. When asked to admit or deny that "Arthur Urialdes was authorized to act on behalf of Prime Texas Surveys, LLC during all of his meetings and interactions with Ellis," Prime Texas responded, "Admit. He had apparent authority. Deny that he was authorized to commit theft of monies paid by Ellis." From this admission, the jury could have concluded that Urialdes had authority to discuss and receive payments from Ellis on behalf of Prime Texas. The jury could also have concluded that Prime Texas admitted that the monies were "paid by Ellis" to Prime Texas and then stolen by Urialdes. The fact that Urialdes embezzled the monies after Ellis paid them has no relevance to the issue of whether Urialdes had the authority to receive the payment on behalf of Prime Texas in the first place. Additionally, there was also evidence that Urialdes submitted the initial plat proposal to Ellis and signed the contract, as Replat Director, on behalf of Prime Texas. Finally, there was evidence that, when Ellis tendered the first payment to Prime Texas, he did so, by way of credit card payment, to Urialdes. Thus, there was evidence that receiving payments on behalf

---

[4] We note that there was no jury finding regarding Urialdes's actual or apparent authority to act in receiving payments on behalf of Prime Texas. Because, however, findings of fact were neither filed nor requested by Prime Texas, the judgment of the trial court implies all necessary findings of fact to support it. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.3d 80, 83 (Tex. 1992). Whether an agency relationship exists is usually a question of fact. *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 377 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

10

of Prime Texas from its customers for replatting services was within Urialdes's general authority.

*In Furtherance of Prime Texas's Business*

The parties in this case stipulated in the jury charge that "Ellis and Prime Texas entered an agreement for survey and replatting services for the Property." Urialdes negotiated and signed this contract on behalf of Prime Texas, as its "Replat Director." In fulfillment of this contract, Ellis paid the first installment of $4,242,53 to Prime Texas via credit card payment, which Urialdes accepted on Prime Texas's behalf. When the second installment became due, Ellis, at Urialdes's instruction, tendered a check to Urialdes that left the payee line blank. As discussed above, Urialdes was authorized by Prime Texas in all his communications with Ellis. The second payment was necessary before Prime Texas would complete its contractual obligations. Thus, Urialdes's receipt of the check was in furtherance of Prime Texas's business.

*For the Accomplishment of the Object for which Urialdes was Employed*

Finally, there was evidence from Prime Texas's owner that Urialdes was first employed by Prime Texas to aid in business development, but that he was later designated as "Replat Director" to provide replatting services to Prime Texas's customers. Communicating with and receiving payments from Prime Texas's

11

customers for replatting services part of Urialdes's duties and was done to accomplish the purpose for which Urialdes was employed.

Nevertheless, Prime Texas, citing *Millan v. Dean Witter Reynolds, Inc.*, 90 S.W.3d 760, 768 (Tex. App.—San Antonio 2002, pet. denied), argues that Prime Texas cannot be held vicariously liable for the tortious conduct of Urialdes. In that case, Millan, a Dean Witter client, sued the company when her son, a Dean Witter employee, took money from his mother's deposits at Dean Witter and deposited them into a fictious account that he opened himself, from which he wrote himself checks. *Id.* at 763. The court held that Dean Witter could not be held vicariously liable for the son/employee's actions because, even though opening the brokerage account was within his general authority, stealing checks from his mother's bathroom drawer, writing checks on his mother's account, depositing his mother's checks in his own account, forging his mother's signature, stealing statements and sending bogus statements and opening a P.O. box to receive his mother's mail, "were not related to [the son/employee's] duties and were not within his general scope of authority as a broker for Dean Witter." *Id.* at 768. Of course, the distinguishing factor between *Millan* and this case is that, in *Millan*, the employee stole from a client, for which Dean Witter could not be vicariously responsible. In this case, Urialdes's subsequent embezzlement from his employer, Prime Texas, has no

12

bearing on whether he was acting in the course and scope of his employment when he communicated with and received Prime Texas's payment from Ellis.

After reviewing the evidence, we conclude that there is more than a scintilla of evidence to support the jury's finding that Urialdes was acting in the course and scope of his employment. *See City of Keller*, 168 S.W.3d at 810; *Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied) ("Anything more than a scintilla of evidence is legally sufficient to support the finding."). We further conclude that the evidence supporting the jury's course-and-scope finding is not so weak as to render the award clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we hold that legally and factually sufficient evidence supports the finding that Urialdes was acting in the course and scope of his employment.

Accordingly, we overrule issue one.

### *DTPA Violations*

In issue two, Prime Texas contends that "[s]ince there is legally and factually insufficient evidence for the jury's finding that Urialdes was acting in the course and scope of his employment, there is also legally and factually insufficient [evidence] for the jury findings" on Ellis's DTPA and fraud claims. Because issue two assumes that issue one will be resolved in Prime Texas's favor, and it was not, we also overrule issue two.

13

### *"Knowing" Violation of DTPA*

Having found against Prime Texas on the two predicate DTPA questions and having awarded damages to Ellis resulting therefrom, the jury was asked the following question:

> Did Prime Texas engage in the conduct found in response to Question No. 3 or No. 4 knowingly?
>
> "Knowingly" means actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.
>
> In answering this question, consider only the conduct that you have found was a producing cause of damages to Ellis.

Five of the jurors answered "Yes," while one juror answered "No."[5]

In issue three, Prime Texas contends that "[t]he evidence is legally and factually insufficient to support the jury finding that Prime Texas [] knowingly violated the DTPA." Essentially, Prime Texas argues that it was not aware of Urialdes's conduct, and that it only became aware of Urialdes's communications with Ellis after Urialdes had been fired. Prime Texas's position is that all the DTPA violations found in jury questions nos. 3 and 4 were based on Urialdes's conduct, and not on its own conduct.

---

[5] The jury was instructed that "you will render your verdict upon the vote of five or more members of the Jury. The same five or more of you must agree upon all of the answers made and to the entire verdict."

14

However, there was evidence in this case that Prime Texas, itself, knew that Ellis had tendered his second payment to Prime Texas by giving a check to Urialdes and that Urialdes was authorized to accept it. Prime Texas also acknowledged that Urialdes had apparent authority in all his interactions with Ellis. Despite knowing that Ellis had tendered his second payment to the company by giving a check to Urialdes, Prime Texas refused to complete the replat unless Ellis paid it again. Thus, Prime Texas sought to shift the loss caused by its own employee's embezzlement to Ellis. There was also evidence that Prime Texas knew that Ellis had paid it because, when Prime Texas sued Urialdes, its damages calculation included the monies that Ellis had paid them, but that it alleged that Urialdes had stolen. By seeking to recover the monies from both Urialdes and Prime Texas, the jury could have determined that Prime Texas's own conduct relating to the DTPA violations was done knowingly.

Thus, we conclude that there is more than a scintilla of evidence to support the jury's finding that Prime Texas knowingly violated the DTPA. *See City of Keller*, 168 S.W.3d at 810; *Antonov*, 168 S.W.3d at 908 ("Anything more than a scintilla of evidence is legally sufficient to support the finding."). We further conclude that the evidence supporting the jury's "knowing" finding is not so weak as to render the award clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176.

Accordingly, we hold that legally and factually sufficient evidence supports the finding that Prime Texas knowingly violated the DTPA.

Accordingly, we overrule issue three.

*Damages*

In jury question no. 6, the jury awarded Ellis $9,685.06 for Prime Texas's DTPA violations; in jury question no. 8, the jury awarded Ellis an additional $20,000.00 in damages because it found that Prime Texas acted "knowingly" in causing the DTPA damages. In issue four, Prime Texas contends that there is legally and factually insufficient evidence to support these damages findings.

In the first subsection of issue four, Prime Texas argues that the award in jury question no. 6 should be reduced by $4,554.10, which is the value the Prime Texas contends Ellis received because of Prime Texas's completion of the survey and c-City Planning Letter. At trial, Ellis testified that, even though he received the survey and city planning letter, those items were useless to him because no other company that he contacted was willing to rely on a survey completed by another company. In contrast, Prime Texas presented evidence at trial that that other companies could have used the survey that it completed for Ellis, even though Ellis would have to pay again for the completion of the replatting.

When, as here, the jury is presented with conflicting testimony, the fact finder may believe one witness and disbelieve others, and it may resolve inconsistencies in

16

the testimony of any witness. *McGalliard*, 722 S.W.2d at 697. Because the jury was presented with conflicting testimony regarding the value of the survey and City Planning Letter that Ellis received from Prime Texas, we defer to the fact finder's resolution of disputed evidentiary issues. *See*, *e.g.*, *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (factual sufficiency); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (legal sufficiency).

In the second subsection of issue four, Prime Texas argues that "with regard to the jury's finding regarding the damages in Question No. 8, there should have been no damages awarded because the evidence is clear that Prime Texas did not commit any knowing DTPA violation." Because that this argument assumes that issue three above would be resolved in Prime Texas's favor, and it was not, we also overrule this subsection of issue four.

We conclude that there is more than a scintilla of evidence to support the damages awarded in jury questions 6 and 8. *See City of Keller*, 168 S.W.3d at 810; Antonov, 168 S.W.3d at 908 ("Anything more than a scintilla of evidence is legally sufficient to support the finding."). We further conclude that the evidence supporting the jury's damage findings is not so weak as to render the awards clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we hold that legally and factually sufficient evidence supports the damages awarded by the jury in jury questions 6 and 8.

17

We overrule issue four.

## ECONOMIC LOSS RULE

In issue five, Prime Texas contends that "Ellis'[s] DTPA claim is barred by the Economic Loss Rule" because "Ellis'[s] DTPA counterclaim is predicated on Prime Texas's failure to perform under the terms of the Contract" and "any misrepresentation by Prime Texas as to the replatting work is governed by contract law, not the DTPA."

However, if a party believes that the jury charge presents an improper measure of damages because it allows the jury to find both tort and contract damages, such party much timely object and make the trial court award of its complaint in order to preserve error for appeal. *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007). No-evidence complaints that do not argue the Economic Loss Rule, by name or in substance, do not clearly and distinctly make the trial court aware of a contention that the Economic Loss Rule applies. *See id.*

In this case, Prime Texas did not object to the jury charge questions on damages and, in its post-judgment motions, it argued only that the evidence was legally and factually insufficient to support the "course-and-scope" and "knowing" findings. Because Prime Texas never argued to the trial court that the Economic Rule was applicable, that contention is waived on appeal. *See id.*

Accordingly, we overrule issue five.

18

## CONCLUSION

We affirm the trial court's judgment.

> Sherry Radack
> Chief Justice

Panel consists of Chief Justice Radack and Justices Hightower and Adams.