**Opinion issued December 21, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00671-CV

———————————

**LION COPOLYMER HOLDINGS, LLC, Appellant**

**V.**

**LION POLYMERS, LLC, Appellee**

On Appeal from the 190th District Court
Harris County, Texas
Trial Court Case No. 2014-10394A

## MEMORANDUM OPINION ON REMAND

Appellant, Lion Copolymer Holdings, LLC (the "Company"), challenged the

trial court's judgment, entered after a jury trial, in favor of appellee, Lion Polymers,

LLC ("LP"), in LP's breach-of-contract suit against the Company. On original

submission of this appeal, the Company raised four issues, challenging the legal and factual sufficiency of the evidence supporting the jury's verdict and contending that the trial court erred in admitting certain evidence and in awarding interest and costs.

We held that the evidence was legally sufficient to support the jury's verdict, that the factual sufficiency point was inadequately briefed, that the trial court did not err in admitting the complained-of evidence, and that the trial court erred in awarding interest and costs. *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 156, 178–79 (Tex. App.—Houston [1st Dist.] 2019), *rev'd*, 614 S.W.3d 729 (Tex. 2020). Accordingly, we reversed the portion of the trial court's judgment awarding pre-judgment interest and remanded for a recalculation, modified the trial court's judgment to delete the award of a specific amount of costs, and affirmed the remainder of the trial court's judgment.

The supreme court disagreed that the factual sufficiency point was inadequately briefed and remanded the case to this court for consideration of the factual sufficiency issue and its effect, if any, on our judgment. *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 735–36 (Tex. 2020).

On remand, we hold that the evidence is factually sufficient to support the jury's finding that the Company breached the parties' contract and the jury's award of damages to LP in the amount of $361,295. We affirm the portion of the trial court's judgment awarding LP damages in accordance with the jury's verdict.

## Background

The Company manufactures synthetic rubber for the automotive and construction industries. Pursuant to the amended "LLC Agreement" (the "Agreement"), under which the Company was formed, the Company's "members," such as LP, share in the Company's profits and proceeds through tiered distribution provisions, or "waterfalls," based on the type and quantity of units, or fractional membership interests in the Company, that each member holds. In 2007, the Company admitted LP as a member and issued it 1,237,500 Class 1 Preferred Units and 1,964,492 Class 3 Common Units. At issue in this case is the Company's distribution of proceeds related to LP's holdings of Class 3 units.

### *Pertinent Portions of the Agreement*

The Company, as a pass-through entity taxed as a partnership, allocates its profits and losses to each individual member, who then pays taxes on the amounts allocated. Because a member may incur tax liability on profits not actually distributed, the Agreement, at section 6.01(d), provides for certain "Tax Advances" as follows, in pertinent part:

> On each Tax Distribution Date, the Company shall, to the extent the Board determines such amounts to be available for distribution, make distributions to the Members in such amounts as the Board determines are sufficient to satisfy the Members' projected estimated income tax liability with respect to the Company's income allocable to their Units for such period. . . . Such tax liability will be calculated as though each Member were an individual residing in the State of New York based upon the highest marginal income tax rates, taking into account U.S.

3

federal, state, and local income taxes . . . , which the Board estimates are applicable, utilizing the respective rates for ordinary income or capital gains, depending on the characterization of the Company's estimated income for such period.  Any distribution made to a member pursuant to this Section 6.01(d) shall be treated as an advanced distribution of, and shall reduce, the amounts next distributable to such Member pursuant to Section . . . 6.02.

Section 6.02 of the Agreement governs how and to whom proceeds are to be paid after a "Recapitalization Transaction," defined as the financing or refinancing of debt secured by the assets of the Company in an amount in excess of $10,000,000, in the aggregate, and followed by the distribution of all, or a significant portion of, such amounts to the members existing as of such date.  Section 6.02(1) generally provides:

> [U]pon a Recapitalization Transaction, after adjusting the Capital Accounts for all distributions made under Section 6.01 and all allocations under this Article 6, all available proceeds distributable to the Members shall be distributed to the Members as follows:
>
> (a)   First, to the Holders of Class 4 Common Units in an amount equal to the amounts owed to such Holders . . . .
>
> (b)   Next, to the Holders of Class 1 Preferred Units until their Unpaid Class 1 Return is eliminated; . . . .
>
> (c)   Next, to the Holders of Class 1 Preferred Units until their Unreturned Class 1 Capital is eliminated; . . . .
>
> (d)   Thereafter, to the Holders of Class 2 Common Units, Class 3 Common Units, and Class 4 Common Units (but not the holders of Class 1 Preferred Units) pro rata in proportion to the number of such Units.

Thus, reading sections 6.01(d) and 6.02 together, the Company advances sufficient cash to each member to satisfy the member's estimated income tax liability and then

4

recoups the advance from a subsequent non-tax distribution of proceeds under, as pertinent here, section 6.02 by reducing the amount of the member's distribution.

***The Instant Suit***

On September 9, 2011, the Company, after a $300,000,000 Recapitalization Transaction, distributed $150,000,000 in proceeds to its members (the "2011 Distribution"). On March 7, 2013, after a $230,000,000 Recapitalization Transaction, the Company again distributed a portion of the proceeds to its members (the "2013 Distribution").

LP, disputing that it had received its proper share of the proceeds in the 2011 and 2013 Distributions, brought a breach-of-contract suit against the Company. In its suit, LP alleged that the Company had improperly (1) withheld certain sums, as a "strike-price deduction," from LP's portion of the 2011 Distribution (the "strike-price claim") and (2) withheld certain section 6.01(d) tax advances twice—once from LP's portion of the 2011 Distribution and again from LP's portion of the 2013 Distribution (the "double-deduction claim"). The trial court granted summary judgment in favor of LP on the strike-price claim, and we affirmed, as modified, the trial court's judgment. *See Lion Co-Polymers Holdings, LLC v. Lion Polymers, LLC*, No. 01-16-00848-CV, 2018 WL 3150863, at *18 (Tex. App.—Houston [1st Dist.] June 28, 2018, pet. denied) (mem. op.). The trial court severed LP's double-deduction claim into the instant suit.

5

In its second amended petition, LP asserted, with respect to its double-deduction claim, that the Company breached the Agreement by failing to distribute proceeds in accordance with its terms. LP asserted that the Company, in paying LP its share of the 2011 Distribution, deducted $361,295 for future tax advances attributable to the third and fourth quarters of 2011 that the Company had not yet paid to LP. LP asserted that the Agreement did not authorize deductions for future tax advances. Subsequently, the Company paid LP the tax advances at issue. However, in paying LP its share of the 2013 Distribution, the Company again deducted $361,295 as a recoupment of the same tax advances.

LP explained that it had learned about the double-deduction through its deposition in the underlying strike-price suit of the Company's Tax Matter Member, Rich Furlin. LP notified the Company that, in support of its claim, it intended to introduce at trial a spreadsheet that Furlin created in February 2012 (the "February 2012 Spreadsheet") and his deposition testimony about the spreadsheet. The Company moved to exclude the February 2012 Spreadsheet and "any testimony related to that spreadsheet." The trial court denied the Company's motion.

*Trial*

At trial, Stephen Lyttleton, an owner and manager of LP, testified that, on September 9, 2011, he received a letter from Furlin describing LP's share of the 2011 Distribution, with respect to both its Class 1 and Class 3 units. The trial court

6

admitted into evidence a notice of wire transfer, reflecting the Company's payment to LP for its Class 1 and Class 3 units, combined. Furlin also sent Lyttleton a spreadsheet detailing how he had calculated LP's share. Lyttleton testified that Furlin's calculations were incorrect because none of the tax advances that LP had received in 2010 and prior to the date of the 2011 Distribution had been deducted.

Lyttleton testified that, to correct the errors, Furlin compiled and sent to LP the February 2012 Spreadsheet. He testified that the February 2012 Spreadsheet also contained errors, however. Although Furlin had properly deducted the tax advances that the Company had paid to LP in 2010 and prior to the September 9, 2011 Distribution, he had also improperly deducted future tax advances, i.e., for the third and fourth quarters of 2011 that the Company had not yet paid to LP. Lyttleton testified that the Agreement did not authorize the Company to make deductions for future tax advances. He testified that the total amount that the Company should have deducted from the 2011 Distribution for LP's tax advances attributable to its Class 3 units was $1,603,197. However, the February 2012 Spreadsheet showed that LP "Class 3 had $1,964,492 deducted from its . . . 2011 [D]istribution."

Lyttleton testified that the difference, $361,295, was attributable to LP's tax advances for the third and fourth quarters of 2011. The trial court admitted into evidence the February 2012 Spreadsheet, which reflects that a total of $1,964,492 in "Article 6.01(d) Distributions," or tax advances, was deducted from LP's share of

7

the 2011 Distribution, including "Tax Allocations" in the amount of $313,328 and $47,967, totaling $361,295, for the third and fourth quarters of 2011, as follows:

| Total | Unapplied 8/2010 | 9/2010-8/2011 | Q3 2011 | Q4 2011 |
|---|---|---|---|---|
| 1,964,492 | 146,071 | 1,457,126 | 313,328 | 47,967 |

On February 21, 2012, Furlin sent Lyttleton an email stating that he had "applied the Article 6.01(d) distributions for [LP's] Class 3 Common to equal $1,964,492 in the September 2011 distribution detail schedule."  On February 23, 2012, Lyttleton sent an email to Furlin, explaining that, although Furlin had properly deducted $146,071 and $1,457,126, a total of $1,603,197, in tax advances that the Company had paid to LP prior to the September 9, 2011 Distribution, he had also improperly deducted future tax advances, i.e., for the third and fourth quarters of 2011, that were not paid to LP prior to the 2011 Distribution.

The trial court admitted into evidence a wire-transfer notice, showing that the Company paid LP a "Q3 Tax Distribution" on September 15, 2011.  Lyttleton noted that the sum transferred was for its Class 1 and Class 3 units combined and that the portion attributable to LP's Class 3 units was $313,328.  The Company states in its brief that it paid LP its fourth quarter 2011 tax advance in January 2012.

On March 8, 2012, Lyttleton sent an email to Furlin, with an attached spreadsheet, asking to discuss the errors in the February 2012 spreadsheet in light of Lyttleton's own "draft" calculations.

8

On May 25, 2012, LP, through its principal, Pete De Leeuw, sent an email to the Company's board of directors, Company manager Goradia Capital ("Goradia"), and Furlin, stating that LP's tax attorney, Robert Phillpott, had analyzed the actual distributions to understand whether the Agreement had been properly followed. The trial court admitted into evidence Phillpott's report and spreadsheets.

In his report, Phillpott stated that he had reviewed a Goradia spreadsheet dated April 17, 2012[1] and had concluded that there existed "material differences for all Members with respect to the amounts that should have been distributed to the Members through the 2011 [Distribution]." With respect to LP's tax advances, Phillpot concluded that LP, prior to a 2010 recapitalization transaction, had received cumulative tax advances in the amount of $238,086. And, between that date and the September 9, 2011 Distribution, LP had received cumulative tax advances in the amount of $2,375,013. The trial court admitted into evidence cancelled checks and bank records reflecting these amounts.

Lyttleton explained that Phillpott's stated sums included LP's tax advances for *both* its Class 1 and Class 3 units. Thus, to obtain the portions of the tax advances attributable solely to LP's Class 3 units at issue in this case, the advances must be multiplied by the portion of the total amount attributable to LP's Class 3 units, i.e.,

---

[1]     This spreadsheet is not included in the appellate record.

61.35 percent.[2] Doing so resulted in $146,066 in tax advances attributable to LP's Class 3 units for 2010 and $1,457,070 in tax advances attributable to LP's Class 3 units through the date of the 2011 Distribution. Together, these total $1,603,136 in tax advances attributable to LP's Class 3 units that should have been deducted from LP's share of the 2011 Distribution. Lyttleton noted that these amounts approximated those shown on the February 2012 Spreadsheet. The issue, however, was that the February 2012 Spreadsheet went further and also deducted future tax advances, i.e., a total of $361,295 for the third and fourth quarters of 2011 that the Company had not yet paid to LP.

On March 7, 2013, Lyttleton received a letter from Company accountant David Wascom, notifying LP of its 2013 Distribution and explaining that the tax advances that the Company had paid to LP after the 2011 Distribution would be deducted. Thus, LP's third and fourth quarter 2011 advances, which were actually paid to LP after the date of the 2011 Distribution, were again deducted from LP's share of the 2013 Distribution. Lyttleton testified that, based on the double deduction, LP had suffered damages in the amount of $361,295.

---

[2] The record shows that members, such as LP, owning more than one classification of membership interest, i.e., Class 1 and Class 3, have a single capital account, but the taxable income is allocated to each type of membership unit. Thus, LP's capital account reflected an ownership interest based on the sum of its Class 1 and Class 3 units, of which 38.65% was allocated to LP's Class 1 units and 61.35% was allocated to its Class 3 units.

10

Vijay Goradia, chairman of the boards of Goradia and the Company, testified, by videotaped deposition, that he "rel[ied] on Rich Furlin to do the calculations" pertaining to the Company's tax advances and distributions. He testified that Goradia manages the Company and that Furlin had worked for Goradia since it began managing the Company.

Furlin testified at trial that, as secretary of the Company and its Tax Matter Member, it was his responsibility to ensure that the members' distributions were correct. He noted that he was also a vice president of Goradia. He testified that he was "the person who calculated the 2011 Section 6.02 distribution that the Company paid." He admitted that the initial calculations supporting the 2011 Distribution to LP were incorrect because LP's tax advances paid prior to the 2011 Distribution had not been deducted in accordance with the Agreement. He performed the recalculation of the 2011 Distribution in the February 2012 Spreadsheet, a file he titled: "Lion 2011 Distribution, Final Reallocation, February 2012."

Furlin testified that only $1,603,197 had been paid to LP as tax advances on its Class 3 units prior to the 2011 Distribution and that the Agreement did not authorize the Company to deduct future tax advances from its distributions. He admitted that he applied $1,964,492 in the February 2012 Spreadsheet because he had included $361,295 attributable to LP's third and fourth quarter 2011 tax advances, which had not yet been paid. He explained that he used the incorrect

11

deduction of $1,964,492 in the February 2012 Spreadsheet because the Company "had another lawsuit going on unrelated to this. And [he] thought that what [he] was supposed to do was put in that amount that was . . . being disputed in the other lawsuit." He added: "I thought that that was the right number to put in given what was transpiring. It was a mistake, and I was wrong."

Furlin also testified that the Company did not actually use the February 2012 Spreadsheet or the spreadsheets later prepared by Lyttleton or Phillpott. Rather, the Company obtained its "final calculation" from its attorney, Corby Brooks. Furlin testified that, in June 2012, Brooks compiled a set of spreadsheets (the "June 2012 Spreadsheet"), which Brooks submitted to the Company attached to a letter titled, "Confidential Settlement Negotiations." Furlin explained that the June Spreadsheet was "used to determine how much people should have gotten in 2010 versus what they got in 2010, and how much they should have gotten based on the correct calculation in 2011 versus how much they did get in cash in 2011." Furlin later testified, however, that Brooks's June 2012 Spreadsheet was also not the final schedule.

Furlin also testified that the Company finalized its calculations in August 2012, determined that it had actually overpaid LP in the 2011 Distribution, and resolved to recoup such overpayment by withholding certain sums from LP, as follows:

12

Q. .... When did the Company actually complete its work with respect to trying to figure out how to adjust the distributions that had already been made to take into account these tax advances?

A. It—it took until the beginning of August 2012 for us to know exactly what the right amounts of the final distribution should be.

Q. All right. And how did you communicate that determination to Mr. Lyttleton?

A. Well, there are—there are two ways. One is, each quarter, we knew people owed—we knew certain people owed money. So each quarter from December through the second quarter of 2012, we were taking out estimates of what we thought the final would be. So they knew that in—that in Q1—or the fourth quarter of 2012, their entire—that we were going to be make a repayment of $600,000. They knew in 20—in the first quarter we were making another 200—400,000. And that by the June tax distribution, we had withheld another 200,000.

So the sum of that all was $1.3 million. And then we sent [Lyttleton] that—all—and all the shareholders their notification of whether they were getting money or whether they had owed money. But everybody had had their payments already reduced by that time. But it took through August of 2012 to get everything finalized.

Thus, testified Furlin, there was not a double-deduction of tax advances. The trial court admitted into evidence the Company's spreadsheet (the "August 2012 Spreadsheet"), reflecting that LP owed the Company $1,331,655, of which $865,361 was attributed to its Class 3 units.

With respect to correlating the Company's spreadsheets with actual distributions to LP, Furlin testified:

Q. You heard some assertions that this is all about following the money, and you have to tick and tie everything, and you have to show that everything ties to cash, and you should reconcile the

13

bank accounts because the bank accounts will show that everything ticks and ties, right?

A.　That was what was said, yes.

Q.　But you admit that the final spreadsheet, whatever the final spreadsheet is, won't actually tie to what was actually distributed to all of the unitholders, would it?

A.　Well, these are deductions. These aren't how much was paid in cash.

Furlin noted that, although the Company, in its live answer in this case, stated that it had "made $1,935,154 in Section 6.01 distributions [tax advances]" to LP, that was "wrong." He further noted that, in May 2015, he executed an affidavit[3] in this case stating that, prior to the 2011 Distribution, LP "received a total of over 1.9 million in Section 6.01 distributions [tax advances] related to its Class 3 units" and that he was including amounts paid for the entire month of September.

In the excerpts of his videotaped deposition presented to the jury, Furlin testified that he was "the only one that made calculations that the Company used"; that the February 2012 Spreadsheet was the final spreadsheet that he compiled; and that the "ultimate amount" withheld in tax advances from LP's share of the 2011 Distribution was "1 million 964."

Wascom, a certified public accountant from the firm Hannis T. Bourgeois, testified that he prepared tax allocations and returns for the Company. He "did not do any calculations." He testified that it was Furlin who created the spreadsheets

---

[3]　The affidavit itself was not admitted into evidence.

from which the Company eventually made its 2011 Distribution to members, as follows:

> Q. So you don't know what the Company actually did in 2011 because you didn't review any of Furlin's spreadsheet calculations of the 2011 distribution, did you?
>
> A. Not at that time, but subsequently I did.
>
> . . . .
>
> Q. But you told me at the deposition that you didn't review any of them?
>
> A. I didn't review his calculations, but I have to be provided the calculations to know how much distributions each member gets in preparation of a tax return.
>
> Q. So it's your testimony that you looked at the spreadsheets, you just didn't check his calculations?
>
> A. And let's—let's be clear. Which spreadsheets are you referring to?
>
> Q. I'm referring to the spreadsheets that Mr. Furlin made to calculate the 2011 Section 6.02 distribution.
>
> A. I would have had to have seen those spreadsheets.
>
> Q. You looked at those spreadsheets?
>
> A. Yes.
>
> . . . .
>
> Q. *You agree with me that it was Rich Furlin who created the spreadsheets that calculated payments made to the members for Section 6.02 distributions that were eventually made, don't you?*
>
> A. *Yes.*
>
> Q. *Not Corby Brooks, somebody else. It was Rich Furlin, right?*
>
> A. *Correct.*

(Emphasis added.)

On cross-examination, Wascom testified that he had used the August 2012 Spreadsheet, which he stated represented the final correction to LP's share of the 2011 Distribution, in preparing tax documents (including LP's Schedule K-1 tax form) and that, according to such calculations, LP was overpaid in the 2011 Distribution and owed the Company $1.3 million. On redirect, however, Wascom again testified that Furlin had performed the calculations:

Q. Rich Furlin did the calculations, right?
A. Which calculations?
Q. The—the 2011 Section 6.02 calculations, right?
A. Yes.

On March 7, 2013, Wascom sent a letter to LP stating that he was preparing the 2013 Distribution and had taken into account all section 6.01(d) tax advances since the 2011 Distribution, which included the third and fourth quarter 2011 tax advances.

Eugene Kenyon, the managing director of Goradia and a member of the Company's board of directors, testified that, based on August 2012 Spreadsheet, which he stated was the final spreadsheet, the Company withheld $1,331,655 from LP's 2011 Distribution.

In its charge, the trial court asked the jury to determine whether the Company "failed to comply with the [Agreement] by double deducting $361,295 in tax advances from LP" and, if so, to determine the amount of damages, if any, owed to

16

LP. The jury answered that the Company had breached the Agreement and awarded damages to LP in the amount of $361,295. The trial court entered a judgment on the verdict, awarding LP damages in the amount of $361,295. The trial court also awarded LP pre-judgment interest in the amount of $66,072.44 through April 19, 2017, increasing by $49.49 per day until the date of judgment, May 24, 2017, and costs in the amount of $3,707.85.

*Appeal*

The Company appealed the trial court's judgment to this Court, challenging the legal and factual sufficiency of the evidence and asserting that the trial court erred in admitting Furlin's testimony about the February 2012 Spreadsheet and erred in assessing pre-judgment interest and costs. *Lion Copolymer Holdings*, 614 S.W.3d at 175–76.

The Company asserted that the evidence was legally and factually insufficient to support the jury's findings that the Company breached the Agreement and that LP was entitled to $361,295 in damages. *Id.* at 166.

We noted that a party challenging the legal sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof must demonstrate that there is no evidence to support the adverse finding. *Id.* at 166–67. And, in conducting a legal-sufficiency review, we consider evidence in the light most favorable to the verdict and indulge every reasonable inference that would

17

support it. *Id.* at 167. We noted that it was within the province of the jury to resolve conflicts in the evidence and that the jury is the sole judge of the witnesses' credibility and may choose to believe one witness over another. *Id.*

It was undisputed that the Agreement was valid and that it did not authorize the Company to deduct future tax advances from its distributions to LP. *Id.* at 168, 170. The issue presented was whether the Company breached the Agreement by deducting future tax advances from LP's 2011 Distribution. *Id*. at 167–68.

We concluded that, from the evidence and testimony, the jury could have reasonably found that $1,603,197 had been paid to LP as tax advances on its Class 3 units prior to the 2011 Distribution, but that Furlin applied $1,964,492 in the February 2012 Spreadsheet because he had included $361,295 attributable to LP's future third and fourth quarter 2011 tax advances. *Id.* at 170. Although Furlin testified that $1,964,492 was "not the ultimate amount that was actually distributed" and that "the ultimate distribution" was later "finalized" in "the final August 2012 schedule," this testimony was impeached by Furlin's deposition testimony that he was "the only one that made calculations that the Company used"; that the February 2012 Spreadsheet was the final spreadsheet that he compiled; and that the "ultimate amount" withheld in tax advances from LP's share of the 2011 Distribution was "1 million 964." *Id.* And, Furlin testified that, long after the events, in May 2015, he executed an affidavit in this case stating that, prior to the 2011 Distribution, "[LP]

18

received a total of over 1.9 million in Section 6.01 distributions related to its Class 3 units." *Id.*

The Company asserted that the evidence of the parties' continuing discussions and the existence of subsequent spreadsheets "conclusively established" that it did not use the February 2012 spreadsheet and instead used the August 2012 Spreadsheet. *Id.* at 166, 169. We concluded that the jury could have reasonably chosen to credit Goradia's and Furlin's testimony that Furlin was in charge of calculating the distributions to members and ensuring their accuracy; Furlin's testimony that the February 2012 Spreadsheet was the last set of calculations that he prepared and that he was "the person who calculated the 2011 Section 6.02 distribution that the Company paid"; and Wascom's testimony that Furlin "created the spreadsheets that calculated the payments made to the members for the section 6.02 distributions that were eventually made." *Id.* at 169–70.

We concluded that the ongoing nature of the dispute, without more, did not establish that the February 2012 Spreadsheet was not ultimately used or that the third and fourth quarter 2011 tax advances were not twice deducted from LP's distributions. *Id.* Furlin, himself, testified that the subsequent spreadsheets by Lyttleton, Phillpott, and Brooks were not used. *Id.* Although Furlin and Wascom testified that the Company used the August 2012 spreadsheet, their testimony was inconsistent, and the jury could have reasonably discredited it. *Id.*

The Company asserted that, between January 2010 and March 8, 2013, it paid LP $19,719,245.27 and that there was no evidence that the total amount it owed LP differed from that amount. *Id.* at 171. We noted that LP's burden at trial, however, was limited to presenting evidence supporting its claim for damages in the amount of $361,295. *Id.*

Considering the evidence in the light most favorable to the verdict, we concluded that there was more than a scintilla of evidence that the Company breached the Agreement by twice deducting the tax advances at issue from LP's distributions and that LP was damaged in the amount of $361,295. *Id.* We held that the evidence was legally sufficient to support the jury's findings. *Id.*

We concluded that the Company failed to adequately brief its factual sufficiency issue because, although it recited an "alternative" factual-sufficiency challenge, it did not advance a distinct factual-sufficiency argument. That is, it did not explain why the jury's findings were so contrary to the great weight and preponderance of the evidence as to make them clearly wrong and unjust. *Id.*

The Company argued that the trial court erred in denying its motion to exclude Furlin's deposition testimony about the February 2012 Spreadsheet because the probative value of the testimony was substantially outweighed by the danger of unfair prejudice and misleading the jury. *Id.* at 172. We held that the trial court did not err in admitting the complained-of evidence. *Id.* at 174–75.

The Company also asserted that the trial court erred in assessing pre-judgment interest because it used an incorrect accrual date. *Id.* at 175. We held that the trial court erred in assessing pre-judgment interest beginning on September 3, 2013, rather than beginning on October 30, 2015. *Id.* at 176. We reversed this portion of the trial court's judgment and remanded for a recalculation. *Id.* at 178.

Finally, the Company argued that the trial court erred by taxing specific costs in the judgment and including costs for copies of deposition transcripts. *Id.* at 176. We held that the trial court erred by taxing the Company with a specific amount of costs in the judgment. *Id.* at 178 (citing *Diggs v. VSM Fin., L.L.C.*, 482 S.W.3d 145, 158 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("The judgment should not state the amount taxed as costs, but only that costs are awarded against a certain party.")). We also held that the trial court erred to the extent that its award included fees for copies of deposition transcripts. *Id.* We modified the trial court's judgment to delete the costs. *Id.* at 178–79. As modified, we affirmed the remainder of the trial court's judgment. *Id.* at 179.

### Remand

In its petition for review in the supreme court, the Company argued that this Court erred in upholding the trial court's denial of its motion to exclude Furlin's deposition testimony about the February 2012 Spreadsheet and erred in concluding that the Company failed to adequately brief its factual sufficiency issue.

The supreme court held that this Court did not err in upholding the trial court's admission of Furlin's deposition testimony. It held, however, that the Company adequately briefed its factual sufficiency issue. The supreme court reversed this Court's judgment and remanded for consideration of the factual sufficiency issue, as follows:

> [W]e grant Company's petition for review, reverse the court of appeals' judgment, and remand the case for the appellate court to consider Company's factual sufficiency complaint and its effect, if any, on its judgment.

*Lion Copolymer Holdings*, 614 S.W.3d at 735–36; *see also Phillips v. Bramlett*, 407 S.W.3d 229, 237–38 (Tex. 2013) (holding that, although not expressly stated, unchallenged portion of court of appeals' judgment was not reversed).

**Factual Sufficiency**

On remand, we consider only whether the evidence is factually sufficient to support the jury's finding that the Company breached the Agreement and the jury's award of damages to LP in the amount of $361,295.

*Standard of Review*

When a party challenges the factual sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637,

22

653 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). In conducting our review, we examine, consider, and weigh all evidence that supports or contradicts the jury's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). The jury is the sole judge of the credibility of the witnesses and the weight of their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The jury may choose to believe one witness and to disbelieve others, and it may resolve inconsistencies in the testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). "It is the province of the jury to resolve conflicts in the evidence, and when reasonable jurors could resolve conflicting evidence either way, we presume they did so in accordance with the verdict." *Gunn v. McCoy*, 554 S.W.3d 645, 665 (Tex. 2018). We set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Francis*, 46 S.W.3d at 242; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

### *Breach and Damages*

To prevail on its breach-of-contract claim, LP was required to establish (1) that a valid contract existed between the parties; (2) that LP tendered performance or was excused from doing so; (3) that the Company breached the terms of the contract; and (4) that LP sustained damages as a result of the Company's breach. *See West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.—

23

Houston [14th Dist.] 2008, no pet.). Here, neither party argues that the Agreement was not a valid contract or that LP failed to tender performance. The Company asserts, rather, that the evidence is insufficient to support the jury's finding that the Company breached the Agreement by deducting the same tax advances twice and that LP incurred damages in the amount of $361,295.

As its evidence that the Company breached the terms of the Agreement by withholding future tax advances from the 2011 Distribution, LP presented section 6.01(d) of the Agreement which provides, in pertinent part:

> On each Tax Distribution Date, the Company shall, to the extent the Board determines such amounts to be available for distribution, make distributions to the Members in such amounts as the Board determines are sufficient to satisfy the Members' projected estimated income tax liability with respect to the Company's income allocable to their Units for such period. . . . Any distribution made to a member pursuant to this Section 6.01(d) *shall be treated as an advanced distribution of, and shall reduce, the amounts **next** distributable to such Member* pursuant to Section . . . 6.02.

(Emphasis added.) Thus, the parties agreed that the Company would advance sufficient cash to LP to satisfy LP's estimated income tax liability and then recoup these tax advances from LP in a *subsequent* non-tax distribution of proceeds by reducing the amount it paid to LP. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) (holding that we give contract terms their plain, ordinary, and generally accepted meaning).

Lyttleton, an owner and manager of LP, testified that, on September 9, 2011, LP received its first distribution of proceeds from the Company, i.e., the 2011 Distribution. Lyttleton also received a letter from Furlin, describing LP's share of the 2011 Distribution, with respect to both its Class 1 and Class 3 units. It is undisputed that Furlin's calculations were incorrect because none of the tax advances that LP had received in 2010 and prior to the date of the 2011 Distribution had been deducted and that Lyttleton notified Furlin of the errors. Lyttleton testified that LP's tax advances prior to the 2011 Distribution, attributable to its Class 3 units at issue in this case, totaled "1.6 million and a few thousand."

Lyttleton testified that, in February 2012, Furlin compiled and sent to LP the February 2012 Spreadsheet to correct the errors in the 2011 Distribution. However, the February 2012 Spreadsheet also contained errors. Although Furlin had properly deducted the tax advances that the Company had paid to LP in 2010 and prior to the September 9, 2011 Distribution, he had also improperly deducted future tax advances, i.e., for the third and fourth quarters of 2011, that the Company had not yet paid to LP. Lyttleton testified that the Agreement did not authorize the Company to make deductions for future tax advances. He testified that the total amount that the Company should have deducted from the 2011 Distribution for LP's tax advances attributable to its Class 3 units was $1,603,197. However, the February

25

2012 Spreadsheet showed that LP "Class 3 had $1,964,492 deducted from its . . . 2011 [D]istribution."

Lyttleton testified that the difference, $361,295, was attributable to LP's tax advances for the third and fourth quarters of 2011. The February 2012 Spreadsheet reflects that a total of $1,964,492 in "Article 6.01(d) Distributions," or tax advances, was deducted from LP's share of the 2011 Distribution, including "Tax Allocations" in the amount of $313,328 and $47,967, totaling $361,295, for the third and fourth quarters of 2011, as follows:

| Total | Unapplied 8/2010 | 9/2010-8/2011 | Q3 2011 | Q4 2011 |
|---|---|---|---|---|
| 1,964,492 | 146,071 | 1,457,126 | 313,328 | 47,967 |

On February 21, 2012, Furlin sent Lyttleton an email stating that he had "applied the Article 6.01(d) distributions for [LP's] Class 3 Common to equal $1,964,492 in the September 2011 distribution detail schedule." On February 23, 2012, Lyttleton sent an email to Furlin, explaining that, although Furlin had properly deducted $146,071 and $1,457,126, a total of $1,603,197, in tax advances that the Company had paid to LP prior to the September 9, 2011 Distribution, he had also improperly deducted future tax advances, i.e., for the third and fourth quarters of 2011, that were not paid to LP prior to the 2011 Distribution.

The trial court admitted into evidence a wire-transfer notice, showing that the Company paid LP a "Q3 Tax Distribution" on September 15, 2011. Lyttleton noted

26

that the sum transferred was for its Class 1 and Class 3 units combined and that the portion attributable to LP's Class 3 units was $313,328. The Company states in its brief that it paid LP its fourth quarter 2011 tax advance in January 2012.

On March 8, 2012, Lyttleton sent an email to Furlin, Wascom, and Kenyon, with an attached spreadsheet, asking to discuss the errors in the February 2012 spreadsheet in light of Lyttleton's own "draft" calculations.

Lyttleton further testified that, on May 25, 2012, LP, through its principal, De Leeuw, sent an email to the Company, stating that LP's tax attorney, Phillpott, had analyzed the actual distributions. In his report, Phillpott stated that he had reviewed a Goradia spreadsheet dated April 17, 2012 and had concluded that, prior to the 2010 recapitalization transaction, LP received cumulative tax advances in the amount of $238,086. And, between that point and the 2011 Distribution, LP had received cumulative tax advances in the amount of $2,375,013.

Lyttleton explained that Phillpott's stated sums included LP's Class 1 and Class 3 units. Thus, to obtain the portion attributable solely to LP's Class 3 units at issue in this case, such amounts must be multiplied by the portion of the total amount attributable to LP's Class 3 units, i.e., 61.35 percent. Doing so results in $146,066 in cumulative tax advances attributable to LP's Class 3 units for 2010 and $1,457,070 in cumulative tax advances attributable to LP's Class 3 units through the date of the 2011 Distribution. Together, these total $1,603,136 in tax advances

27

attributable to LP's Class 3 units that should have been deducted from LP's share of the 2011 Distribution. Lyttleton noted that these amounts approximated those that Furlin had stated in the February 2012 Spreadsheet for these same time periods. The issue, however, was that the February 2012 Spreadsheet went further and also deducted future tax advances, i.e., a total of $361,295 for the third and fourth quarters of 2011 that the Company had not yet paid to LP.

Lyttleton further testified that, on March 7, 2013, he received a letter from Wascom, the Company's accountant, notifying LP of the 2013 Distribution and that the Company would be deducting the tax advances paid to LP since the 2011 Distribution. Lyttleton testified that, because the third and fourth quarter 2011 tax advances at issue were actually paid to LP after the date of the 2011 Distribution, the same advances that Furlin had previously deducted from LP's share of the 2011 Distribution were deducted a second time in the 2013 Distribution. And, based on this double deduction, LP had suffered damages in the amount of $361,295.

Furlin testified at trial that, as secretary of the Company and its Tax Matter Member, it was his responsibility to ensure that the members' distributions were correct. And, he testified that he was "the person who calculated the 2011 Section 6.02 distribution that the Company paid." He admitted that the initial calculations supporting the 2011 Distribution to LP were incorrect because LP's tax advances for 2010 and through the 2011 Distribution had not been deducted in accordance with

28

the Agreement. He performed the recalculation of the 2011 Distribution in the February 2012 Spreadsheet, a file he titled: "Lion 2011 Distribution, Final Reallocation, February 2012."

Furlin testified that the Company had paid LP a total of $1,603,197 as tax advances on its Class 3 units prior to the 2011 Distribution. He admitted that he had applied $1,964,492 in the February 2012 Spreadsheet because he had included $361,295 attributable to LP's third and fourth quarter 2011 tax advances, which had not yet been paid. And, he testified that the Agreement did not authorize the Company to deduct future tax advances from its distributions. He explained that he used the incorrect deduction of $1,964,492 in the February 2012 Spreadsheet because the Company "had another lawsuit going on unrelated to this. And [he] thought that what [he] was supposed to do was put in that amount that was . . . being disputed in the other lawsuit." He added: "I thought that that was the right number to put in given what was transpiring. It was a mistake, and I was wrong."

Furlin testified that the amount stated in the February 2012 Spreadsheet, i.e., $1,964,492, was "not the ultimate amount that was actually distributed." He stated that the Company obtained its "final calculation" from Brooks's June 2012 Spreadsheet. He later testified, however, that the June 2012 Spreadsheet was not the final schedule. Furlin also testified that the Company did not use any of the spreadsheets created by Littleton or Phillpot. Rather, the Company finalized its

calculations in August 2012, determined that it had actually overpaid LP $1.3 million in the 2011 Distribution, and resolved to recoup such overpayment by withholding certain sums from LP, as follows:

> Q. . . . . When did the Company actually complete its work with respect to trying to figure out how to adjust the distributions that had already been made to take into account these tax advances?
>
> A. It—it took until the beginning of August 2012 for us to know exactly what the right amounts of the final distribution should be.
>
> Q. All right. And how did you communicate that determination to Mr. Lyttleton?
>
> A. Well, there are—there are two ways. One is, each quarter, we knew people owed—we knew certain people owed money. So each quarter from December through the second quarter of 2012, we were taking out estimates of what we thought the final would be. So they knew that in—that in Q1—or the fourth quarter of 2012, their entire—that we were going to be make a repayment of $600,000. They knew in 20—in the first quarter we were making another 200—400,000. And that by the June tax distribution, we had withheld another 200,000.
>
> So the sum of that all was $1.3 million. And then we sent [Lyttleton] that—all—and all the shareholders their notification of whether they were getting money or whether they had owed money. But everybody had had their payments already reduced by that time. But it took through August of 2012 to get everything finalized.

Thus, testified Furlin, there was not a double-deduction of tax advances.

The August 2012 Spreadsheet reflects that, prior to August 2010, LP received tax advances attributable to its Class 3 units in the amount of $146,071, which matches the February 2012 Spreadsheet. In addition, the August 2012 Spreadsheet reflects that, between August 2010 at the 2011 Distribution, LP received tax

30

advances attributable to its Class 3 units in the amount of $1,457,137, which closely approximates the $1,457,126 stated in the February 2012 Spreadsheet. However, the August 2012 Spreadsheet reflects that LP *owed* the Company $1,331,655, of which $865,361 was attributed to its Class 3 units.

With respect to correlating the Company's spreadsheets with actual distributions to LP, Furlin testified:

Q.   You heard some assertions that this is all about following the money, and you have to tick and tie everything, and you have to show that everything ties to cash, and you should reconcile the bank accounts because the bank accounts will show that everything ticks and ties, right?

A.   That was what was said, yes.

Q.   But you admit that the final spreadsheet, whatever the final spreadsheet is, won't actually tie to what was actually distributed to all of the unitholders, would it?

A.   Well, these are deductions. These aren't how much was paid in cash.

Furlin testified that, although the Company, in its live answer in this case, had stated that it "made $1,935,154 in Section 6.01 distributions [tax advances]" to LP, that was "wrong." He further explained that, although, in May 2015, long after the events at issue, he executed an affidavit in this case stating that, prior to the 2011 Distribution, LP had "received a total of over 1.9 million in Section 6.01 distributions [tax advances] related to its Class 3 units," he had again included amounts paid for the entire month of September.

In the excerpts of his videotaped deposition presented to the jury, Furlin testified that he was "the only one that made calculations that the Company used"; that the February 2012 Spreadsheet was the final spreadsheet that he compiled; and that the "ultimate amount" withheld in tax advances from LP's share of the 2011 Distribution was "1 million 964."

Vijay Goradia testified, that he "rel[ied] on Rich Furlin to do the calculations" pertaining to the Company's tax advances and distributions.

Wascom testified that he prepared tax allocations and returns for the Company. He testified that Furlin created the spreadsheets from which the Company eventually made its 2011 Distribution to members, as follows:

> Q. So you don't know what the Company actually did in 2011 because you didn't review any of Furlin's spreadsheet calculations of the 2011 distribution, did you?
>
> A. Not at that time, but subsequently I did.
>
> . . . .
>
> Q. But you told me at the deposition that you didn't review any of them?
>
> A. I didn't review his calculations, but I have to be provided the calculations to know how much distributions each member gets in preparation of a tax return.
>
> Q. So it's your testimony that you looked at the spreadsheets, you just didn't check his calculations?
>
> A. And let's—let's be clear. Which spreadsheets are you referring to?
>
> Q. I'm referring to the spreadsheets that Mr. Furlin made to calculate the 2011 Section 6.02 distribution.
>
> A. I would have had to have seen those spreadsheets.

Q. You looked at those spreadsheets?

A. Yes.

. . . .

Q. *You agree with me that it was Rich Furlin who created the spreadsheets that calculated payments made to the members for Section 6.02 distributions that were eventually made, don't you?*

A. *Yes.*

Q. *Not Corby Brooks, somebody else. It was Rich Furlin, right?*

A. *Correct.*

(Emphasis added.)

On cross-examination, Wascom testified that he had used the August 2012 Spreadsheet, which he stated represented the final correction to LP's share of the 2011 Distribution, in preparing tax documents (including LP's Schedule K-1 tax form) and that, according to such calculations, LP was overpaid in the 2011 Distribution and owed the Company $1.3 million. On redirect, however, Wascom again testified that Furlin had performed the calculations:

Q. Rich Furlin did the calculations, right?

A. Which calculations?

Q. The—the 2011 Section 6.02 calculations, right?

A. Yes.

On March 7, 2013, Wascom sent a letter to LP stating that all section 6.01(d) tax advances since the 2011 Distribution, which included the third and fourth quarter 2011 tax advances, would be deducted from its 2013 Distribution.

33

Kenyon, the managing director of Goradia, testified that, based on August 2012 Spreadsheet, which he stated was the final spreadsheet, the Company withheld $1,331,655 from LP's distributions to correct the Company's overpayment.

Thus, the jury was presented with numerous conflicts in the testimony. Again, the jury is the sole judge of the credibility of the witnesses and of the weight to place on their testimony. *Jackson*, 116 S.W.3d at 761. It may choose to believe one witness and to disbelieve others, and it may resolve inconsistencies in the testimony of any witness. *McGalliard*, 722 S.W.2d at 697. It is within the province of the jury to resolve conflicts in the evidence, and "when reasonable jurors could resolve conflicting evidence either way, we presume they did so in accordance with the verdict." *Gunn*, 554 S.W.3d at 665.

In summation, evidence was presented that, prior to the 2010 recapitalization transaction, LP received cumulative tax advances in the amount of $238,086. And, between that point and the 2011 Distribution, LP received cumulative tax advances in the amount of $2,375,013. The jury could have reasonably credited Lyttleton's testimony that these amounts included LP's Class 1 and Class 3 units and that such amounts must be multiplied by the portion of the total amount attributable to LP's Class 3 units, i.e., 61.35 percent. Doing so results in $146,066 in cumulative tax advances attributable to LP's Class 3 units for 2010 and $1,457,070 in cumulative tax advances attributable to LP's Class 3 units through the date of the 2011

Distribution. And, together, these total $1,603,136 in tax advances attributable to LP's Class 3 units that should have been deducted from LP's share of the 2011 Distribution. The record shows that these amounts approximated those that Furlin stated in the February 2012 Spreadsheet for these same time periods.

The jury could have reasonably chosen to credit Lyttleton's testimony that, based on the February 2012 Spreadsheet, LP "Class 3 had $1,964,492 deducted from its . . . 2011 [D]istribution" and that the difference, $361,295, was attributable to LP's tax advances for the third and fourth quarters of 2011. It was undisputed that the third and fourth quarter 2011 tax advances at issue were actually paid to LP after the date of the 2011 Distribution, that the Agreement did not authorize the Company to make deductions for future tax advances, and that such advances were again deducted from LP's 2013 Distribution. Thus, the jury could have reasonably chosen to believe Lyttleton's testimony that a double deduction occurred and that LP suffered damages in the amount of $361,295.

The jury further could have reasonably chosen to credit Furlin's testimony that, as secretary of the Company and its Tax Matter Member, it was his responsibility to ensure that the members' distributions were correct; that he was "the only one that made calculations that the Company used"; that the February 2012 Spreadsheet was the final spreadsheet that he compiled; that he applied $1,964,492 in the February 2012 Spreadsheet because he had included $361,295 attributable to

LP's third and fourth quarter 2011 tax advances, which had not yet been paid; and that the "ultimate amount" withheld in tax advances from LP's share of the 2011 Distribution was "1 million 964."

Furlin's testimony in this regard was supported by that of Vijay Goradia, chairman of the boards of Goradia and the Company, who also testified that he "rel[ied] on Rich Furlin to do the calculations" pertaining to the Company's tax advances and distributions. Furlin's testimony was also supported by Wascom's testimony that it was Furlin who "created the spreadsheets that calculated the payments made to the members for the section 6.02 distributions that were eventually made." Such testimony was also supported by Furlin's testimony that, long after the events, in May 2015, he testified in an affidavit in this case that, prior to the 2011 Distribution, LP had "received a total of over 1.9 million in Section 6.01 distributions [tax advances] related to its Class 3 units," and that he had included amounts paid for the entire month of September. Such testimony was also supported by Furlin's testimony that the Company, in its live answer in this case, stated that it "made $1,935,154 in Section 6.01 distributions [tax advances]" to LP, which closely approximated the February 2012 Spreadsheet. The jury could have reasonably discredited Furlin's testimony that the Company's answer was simply "wrong."

Furlin testified inconsistently that Brooks's calculations were used and that they were not. Wascom testified that he used the August 2012 Spreadsheet, but he

36

also testified that Furlin had performed the calculations that he used. Thus, the jury could have reasonably chosen to discredit the testimony of Furlin and Wascom that the February 2012 Spreadsheet was not the basis of LP's deductions, that $1,935,154 was not deducted from LP's 2011 Distribution, that the Company finalized its calculations in August 2012, and that it had actually overpaid LP $1.3 million.

The Company asserts that Furlin, Wascom, and Kenyon "testified unequivocally that the February 2012 [S]preadsheet was not used by the Company for any purpose" and that "these witnesses also testified that the final August 2012 spreadsheet was the final spreadsheet that the Company actually used." As discussed above, however, the record shows that the testimony given by Furlin and Wascom was not unequivocal. Kenyon, a member of the Company's board of directors, testified that the August 2012 Spreadsheet was the final spreadsheet that the Company used and that LP owed the Company $1.3 million. It was within the province of the jury to resolve the conflicts and to determine the weight to place on Kenyon's self-serving testimony. *See Jackson*, 116 S.W.3d at 761.

The Company asserts that the August 2012 Spreadsheet "shows that the Company did not deduct the third and fourth quarter tax advances from the prior non-tax distributions, and those figures align perfectly with the Member's bank records." Specifically, it asserts, the final August 2012 Spreadsheet shows that the Company subtracted from $238,086 for LP's cumulative tax advances prior to

August 2010 and subtracted $2,375,013 for LP's cumulative tax advances between August 2010 and the September 2011 Distribution.

Again, the jury could have reasonably chosen to credit Lyttleton's testimony that these amounts included LP's Class 1 and Class 3 units. Thus, to obtain the portion attributable solely to LP's Class 3 units at issue in this case, such amounts had to be multiplied by the portion of the total amount attributable to LP's Class 3 units, i.e., 61.35 percent. Together, these total $1,603,136 in tax advances attributable to LP's Class 3 units that should have been deducted from LP's share of the 2011 Distribution. As Lyttleton noted, these amounts approximate those that Furlin stated in the February 2012 Spreadsheet for these same time periods, i.e., $146,071 and $1,457,126, a total of $1,603,197. And, as Furlin testified, these amounts are deductions and do not represent how much was paid to LP. Thus, the bank records do not reconcile with the spreadsheets.

The Company asserts that the evidence of the parties' continued discussions after the February 2012 Spreadsheet and the existence of subsequent spreadsheets "conclusively established" that the Company used the August 2012 Spreadsheet, as follows:

- Mr. Lyttleton responded only two days after Mr. Furlin sent the February 2012 spreadsheet to "make it clear that [he] did not agree with the calculations," including the tax advance section.
- In March 2012, Mr. Lyttleton sent the Company a spreadsheet which laid out [LP's] draft analysis of the proper distributions.

38

- The Company sent [LP] a spreadsheet dated April 17, 2012, which contained revised calculations.

- In May 2012, [LP] circulated its own analysis and spreadsheet of calculations responding to the Company's April 2012 spreadsheet.

- The Company hired [Brooks] to Member's [sic] May 2012 analysis, which he did in June 2012 with some further calculations.

- In August 2012, the Company finalized the calculations for the reallocation of the distributions and notified members.

- The Company sent [LP] the final August 2012 spreadsheet recalculating the proper amounts of the August 2010 and September 2011 non-tax distributions and deducting only the tax advances that occurred prior to September 2011.

The Company also points to Lyttleton's testimony that, as late as August 2012, the "lawyers were going back and forth on this." The Company asserts that "no reasonable juror could disregard the fact that so many later spreadsheets were exchanged between the parties."

Evidence of the parties' continued discussions and the mere existence of subsequent spreadsheets, without more, does not "establish[] that the Company used the August 2012 Spreadsheet." Again, Furlin testified that the spreadsheets created by Lyttleton, Phillpott, and Brooks were not used or were not final schedules. And, as discussed above, the jury could have reasonably chosen to discredit the testimony about the August 2012 Spreadsheet. The jury could have reasonably concluded that, despite numerous spreadsheets and ongoing discussions, the Company's use of the figures in the February 2012 Spreadsheet was never ultimately corrected—a dispute that culminated in the instant lawsuit.

The Company asserts that, between January 2010 and March 8, 2013, it paid LP $19,719,245.27 and that there was no evidence that the total amount it owed LP differed from that amount. Again, LP's burden at trial, however, was limited to presenting evidence supporting its claim for damages in the amount of $361,295.

Considering all of the evidence that supports or contradicts the jury's finding that the Company breached the Agreement by twice deducting $361,295 in tax advances from LP's distributions and that LP was damaged in the amount of $361,295, we conclude that the jury's findings are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176; *Levine*, 448 S.W.3d at 653. We hold that the evidence is factually sufficient to support the jury's findings.

## Conclusion

On remand, we hold that the evidence is factually sufficient to support the jury's finding that the Company breached the Agreement and the jury's award of damages to LP in the amount of $361,295. We affirm the portion of the trial court's judgment awarding LP $361,295 in damages.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.